In re JOINT EASTERN AND SOUTH-
ERN DISTRICTS ASBESTOS
LITIGATION.

In re Johns–Manville Corporation,
et al., Debtors.

Bernadine K. Findley et al., on behalf of
themselves, and all others similarly
situated as beneficiaries of the Man-
ville Personal Injury Settlement
Trust, Plaintiffs,

v.

Trustees of the Manville Personal Inju-
ry Settlement Trust, not individually
but solely in their capacities as Trust-
ees, Defendants.

Nos. 82 B 11656(BRL) through 82 B
11676(BRL), 90 CV 3973(JBW).

United States District Court,
E. & S.D. New York.
United States Bankruptcy Court,
S.D. New York.

Dec. 27, 2002.

Claims Resolution Management by David T. Austern, Fairfax, VA, for Manville Trust Trustees.

Caplin & Drysdale by Elihu Inselbuch, New York, NY, Ness Motley by Joe Rice, Esq., Mt. Pleasant, SC, for Selected Counsel for the Beneficiaries.

Paul, Weiss, Rifkind, Wharton & Garrison by Leslie Gordon Fagen, Jeffrey Nagel, New York, NY, for Legal Representative of Future Claimants.

RAND Corporation by Mark Peterson, Santa Monica, CA, for Special Advisor to the Trust.

Weitz & Luxenberg, P.C. by Perry Weitz, C. Sanders McNew, New York, NY, Levy Phillips & Konigsberg, LLP by Stanley J. Levy, Esq., New York, NY, Law Offices of Peter T. Nicholl by Timothy Hogan, Baltimore, MD, Goldberg, Persky, Jennings & While by Mark Meyer, Pittsburgh, PA, for Plaintiffs.

Kazan, McClain, Edises, Abrams, Fernandez, Lyons & Farrise by Steven Kazan, Oakland, CA, for Plaintiffs and Unofficial Committee of Select Asbestos Claimants.

Faricy & Roen, P.A. by James R. Harries, Minneapolis, MN, Law Offices of James J. Higgins by James J. Higgins, Florham Park, NJ, for MacArthur Subclass.

Debevoise & Plimpton by Roger E. Podesta, New York, NY, for Owens Corning and Co-defendant Subclass.

Pepper Hamilton, LLP by Francis J. Lawall, Philadelphia, PA, for Distributors Subclass.

Schiff, Hardin & Waite by Robert H. Riley, Chicago, IL, for Owens Illinois.

Goldfein & Hosmer by John A. Turlick, Philadelphia, PA, for Garlock Sealing Technologies LLC.

Orrick, Herrington & Sutcliff, LLP by James Lamont Stengel, New York, NY, Mayer, Brown & Platt by Michael O. Ware, New York, NY, McDermott, Will & Emery by Donald Pugliese, New York, NY, Law Offices of Peter G. Angelos by Paul M. Matheny, Towson, MD, for Interested Persons.

## MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge and BURTON R. LIFLAND, Bankruptcy Judge.

## Table of Contents

I. Introduction .................................................... 300

II. Facts .......................................................... 301
 A. History ..................................................... 301
 1. Asbestos Litigation Crisis ............................... 301
 2. Manville Trust ......................................... 302
 B. Post–1995 Developments .................................... 305
 1. Proliferation of Asbestos Litigation and Claims ......... 305
 2. Functionally Unimpaired Claimants ...................... 306
 a. Diagnosing Asbestos–Related Disease ............... 308
 b. Projecting Future Claims .......................... 310
 c. Compensation Ratios .............................. 312
 3. Manville Trust ......................................... 313
 C. Trust Payments to Date ..................................... 315

III. Law ........................................................... 315
 A. Power to Amend the Trust Distribution Process .............. 315
 B. Claims by Functionally Unimpaired Claimants .............. 317

IV. Application ..................................................... 319
 A. Amendment of the Manville Process .......................... 319
 1. Changes in the 2002 Trust Distribution Process .......... 319
 a. Scheduled Disease Categories and Values ........... 320
 b. Evidentiary Requirements ......................... 324
 c. Pro Rata Share ................................... 324
 d. Other Changes .................................... 325
 e. Transition Provisions ............................. 326
 2. Other Measures ........................................ 326
 B. Criticisms of the 2002 Trust Distribution Process .......... 326
 C. Future ..................................................... 331
 1. Required Research on National Medical Questions ....... 331
 2. Alternative Solutions .................................. 335

V. Conclusion ..................................................... 336

## I. Introduction

The district court for the Eastern District of New York and the bankruptcy court for the Southern District of New York (the "courts") write to give their imprimatur to the amended Trust Distribution Process ("2002 TDP") of the Manville Personal Injury Settlement Trust ("Manville Trust" or the "Trust").

■ It is not clear that the courts have the authority to approve or deny approval of these changes as agreed on by the Trust, the Selected Counsel for the Beneficiaries (the "SCB"), and the Legal Representative of Future Claimants (the "Legal Representative") after consultation with the Special Advisor to the Trust (the "Special Advisor") and other interested parties. It is apparent nonetheless that the courts have a continuing obligation to ensure that the Trust's terms and goals are properly effectuated. *See In re Joint E. & S. Dists. Asbestos Litig.*, 120 B.R. 648, 652 (E. & S.D.N.Y.1990) ("continuing responsibility to implement the terms of the Manville reorganization and to protect the interests of the beneficiaries of the Trust"); Second Amended and Restated Plan of Reorganization for Johns–Manville Corporation Art. X (Nov. 28, 1988) (retention of jurisdiction); Trust Agreements §§ 6.12, 6.13 (same).

Periodic required reports submitted by the Trust are followed closely by the courts. They reveal the Trust's continuing problems. It is appropriate therefore for the courts to evaluate and approve the changes embodied in the 2002 TDP. There is thus currently no need to finally fix the courts' continuing authority to require future changes in the Trust's distribution process.

The asbestos problem and litigation crisis is "a festering wound on our society that is going to continue for some time." Transcript of Proceedings on September 4, 2002, at 35 ("Transcript Sept. 4, 2002"). Despite frequent expressions by the courts during the long course of Johns–Manville Corp. and Manville Trust litigation of their hope that some final resolution would be reached, periodic reevaluation has been necessary in order to ensure that administration of trust funds remains effective and equitable in light of changing conditions.

Amending the Manville Trust Distribution Process ("TDP") has been compelled by major developments in asbestos litigation. There has been a dramatic increase in the total and rate of filing of asbestos lawsuits and claims. Particularly noticeable is the involvement of more peripheral players—plaintiffs who are asymptomatic, those less seriously injured, and defendants who were not major manufacturers or distributors of asbestos.

In the last several years it became evident that the Manville Trust was threatened by a much higher than projected number of claims. A significant and growing percentage of these claims are brought on the basis of non-malignant asbestos-related conditions, that is for asbestosis or other less serious clinical or physical manifestations of asbestos exposure rather than for mesothelioma, lung cancer, or other cancers. It is expected, based on the best currently available data, that this trend will accelerate.

Were the Trust to continue operating under the procedures last established in 1995, there would be a substantial risk that its funds would be insufficient to provide decent compensation for all valid claims. It was widely believed that the TDP, even as modified in 1995, no longer treated all claimants equitably—a primary goal of the Trust. *See In re Joint E. & S. Dists. Asbestos Litig.*, 2001 WL 1464362 (E.D.N.Y.2001).

Responding to current concerns expressed by the courts and others, inter-

ested parties engaged in extensive and lengthy negotiations. In September 2002, the Trust, the SCB, and the Legal Representative, after consultation with the Special Advisor and interested persons, announced that they had agreed to significant amendments to the Trust Distribution Process, in the form of the 2002 TDP. All interested parties were invited to submit written and oral comments to the courts.

After full hearings, the courts approve the 2002 TDP. It is a substantial step forward. It accords with developing tort asbestos litigation. While further changes may be necessary, the 2002 TDP is a significant improvement over the previous distribution processes.

## II. Facts

### A. History

The genesis and history of the asbestos litigation crisis and of the Manville Trust have been set out at length. *See, e.g., In re Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. 710 (E. & S.D.N.Y.1991) (*"Findley I"*); *In re Joint E. & S. Dists. Asbestos Litig.*, 878 F.Supp. 473 (E. & S.D.N.Y. 1995).

### 1. Asbestos Litigation Crisis

Asbestos in its various forms are fibrous minerals, abundant, relatively inexpensive to mine and process, and versatile. Because of its strength, durability, and fire-retardant capabilities, asbestos has been used extensively in industrial and other settings for thousands of years. *See Findley I*, 129 B.R. 710, 734 (E. & S.D.N.Y. 1991); Stephen J. Carroll et al., RAND Institute for Civil Justice, *Asbestos Litigation Costs and Compensation: An Interim Report* 13 (2002) ("RAND Report 2002"); Barbara J. Peters and George A. Peters, *Sourcebook on Asbestos Diseases: Medical, Legal and Engineering Aspects* (1998). Unfortunately, however, asbestos is also

dangerous. Workplace exposure to asbestos fibers risks injury, disease, and mortality. *See* Irving J. Selikoff et al., *The Occurrence of Asbestosis Among Insulation Workers in the United States*, Annals N.Y. Acad. Sci., Vol. 132, 1965, at 139–55 (epidemiological study on disease caused by asbestos exposure). Assessments of risks and benefits varies; there has been substantial reduction of efficacy after abandonment of asbestos in the seventies in such matters as auto brake linings and protection of skyscrapers against cataclysmic fire. Rather than improving protections to workers, this country has sought to close the books on asbestos use. The injuries caused before adequate attention to worker-danger remain to be compensated.

Those injured by asbestos—often not satisfactorily recompensed by worker compensation plans—have been forced to turn to the court system, relying primarily on suits against producers and commercial users of products containing asbestos for deterrence and for reimbursement for the injuries suffered as a result of unwitting exposure. *See generally* RAND Report 2002, *supra*.

The major dangers of asbestos were known in this country as early as the 1930s. *See, e.g.,* Irving J. Selikoff & Morris Greenberg, *A Landmark Case in Asbestosis*, 265(7) J. Am. Med. Assoc. 898 (1991). Yet neither medicine, industry nor the law protected workers adequately. *See, e.g.,* Clean Air Act, 42 U.S.C. §§ 7401–31, 7412 (2002) (federal government first acted to regulate asbestos by designating it as a hazardous air pollutant in the Clean Air Act of 1970); Mark A. Behrens, *Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation*, 54 Baylor L.Rev. 331, 336 n. 25 (2002); Edmund J. Ferdinand, III, *Asbes-*

tos Revisited, 5 Tul. Envtl. L.J. 581, 588 (1992) (state legislatures slow to act, manipulated by the asbestos industry); Roger Parloff, The $200 Billion Miscarriage of Justice, Fortune Magazine, March 4, 2002, available at 2002 WL 2190334 (labor unions did not act aggressively to protect their at-risk members until the 1970s). The courts were, and largely remain, the only viable agency for redress.

The resulting volume of asbestos claims threatened to overwhelm our court system. Despite hopes and expectations to the contrary, the flood of claims continues unabated. Plaintiffs' claims advance like a perpetually "unrolling carpet. At any moment ... some are filed, some are resolved and some are yet to come." Record at 31, Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (No. 97–1704) (Oral argument of Elihu Inselbuch, Esq. on behalf of respondents). The problems inherent in leaving the asbestos fiasco to be dealt with under general tort law through the courts have been the subject of extensive critical discussion. See, e.g., Behrens, supra, at 335, 342–44; Griffin B. Bell, Asbestos Litigation and Judicial Leadership: The Courts' Duty to Help Solve the Asbestos Litigation Crisis, Briefly: Perspectives on Legislation, Regulation, and Litigation, National Legal Center for the Public Interest, Vol. 6, No. 6, June 2002; Lester Brickman, Asbestos Litigation: Malignancy in the Courts?, Civil Justice Forum, No. 40, August 2002; James A. Henderson, Jr. & Aaron D. Twerski, Asbestos Litigation Gone Mad: Exposure–Based Recovery For Increased Risk, Mental Distress, and Medical Monitoring, 53 S.C. L.Rev. 815 (2002); Deborah R. Hensler, As Time Goes By: Asbestos Litigation After Amchem and Ortiz, 80 Tex. L.Rev. 1899 (2002); Samuel Issacharoff, "Shocked": Mass Torts and Aggregate Asbestos Litigation After Amchem and Ortiz, 80 Tex. L.Rev.1925 (2002); Mark A. Behrens & Monica G. Parham,

Stewardship for the Sick: Preserving Assets for Asbestos Victims Through Inactive Docket Programs, 33 Tex. Tech L.Rev. 1 (2001); Paul F. Rothstein, What Courts Can Do in the Face of the Never–Ending Asbestos Crisis, 71 Miss. L.J. 1 (2001); Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 Harv. J.L. & Pub. Pol'y 541 (1992); Parloff, supra.

### 2. Manville Trust

The Manville Trust was one of the earlier manifestations of the forthcoming asbestos litigation crisis. In August 1982, the Johns–Manville Corporation (now known as the Manville Corporation) ("Manville") filed for Chapter 11 bankruptcy. It faced "the mammoth problem of uncontrolled proliferation of asbestos health suits brought against it because of its substantial use for many years of products containing asbestos which injured those who came into contact with the dust of this lethal substance." In re Johns–Manville Corp., 36 B.R. 727, 729 (Bankr. S.D.N.Y.1984); see also Mark D. Plevin & Paul W. Kalish, Where Are They Now? A History of the Companies That Have Sought Bankruptcy Protection Due to Asbestos Claims, Mealey's Asbestos Bankruptcy Rep., Aug. 2001, at 27 (Manville second major asbestos defendant to take this step).

In 1986, following extended proceedings in "these huge, complex, unparalleled reorganization proceedings," the parties presented a largely consensual reorganization plan to the bankruptcy court for confirmation. In re Johns–Manville Corp., 68 B.R. 618, 620 (Bankr.S.D.N.Y.1986). The plan involved the creation of two trusts, one to resolve claims brought by victims of asbestos-related disease, the Manville Personal Injury Settlement Trust (the "Manville Trust" or "Trust"), and the other to re-

solve asbestos-related property claims. *See id.* at 621–22. Manville was to fund the Trust for at least 30 years. *See In re Joint E. & S. Dists. Asbestos Litig.*, 120 B.R. 648, 652 (E. & S.D.N.Y.1990). The plan was ultimately approved over objections. *See In re Johns–Manville Corp.*, 68 B.R. 618, 621–22 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom., Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988). An injunction required all claimants seeking compensation for existing and future asbestos health claims caused by exposure to Manville products to proceed solely against the Trust; Manville and its insurers were immunized. *See id.* at 624–28. The Trust began evaluating and paying claims under its original operating procedures in 1989. By then claimants had been stayed from receiving compensation for some seven years

It quickly became obvious that the Trust's funds were insufficient because of the higher than projected number of claims, rate of filing, and average liquidated value. *See In re Joint E. & S. Dists. Asbestos Litig.*, 120 B.R. 648, 652 (E. & S.D.N.Y.1990); *In re Joint E. & S. Dists. Asbestos Litig.*, 878 F.Supp. 473, 479 (E. & S.D.N.Y.1995). By the spring of 1990, the Trust was unable to meet its current and short-term obligations. Stays on all payments to claimants and all proceedings against the Trust were consequently ordered by the courts until the Trust could be restructured. *See In re Joint E. & S. Dists. Asbestos Litig.*, 120 B.R. at 652, 687–89 (Appendices F, G).

A Special Master, Marvin E. Frankel, was appointed to assess the financial status of the Trust. After holding hearings and receiving extensive submissions, he concluded that the Trust was "deeply insolvent" and that there was a "substantial risk that payments for . . . asbestos relat-

ed claims . . . [would] be in jeopardy." *Id.* at 654, 661–68 (Appendix B).

In November 1990 a class action complaint and a proposed stipulation of settlement were filed. *See id.* at 654. The court certified the suit as a mandatory non-opt out class action under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure. The class consisted of "all beneficiaries each of whom has or will have a claim either for death or personal injury caused by exposure to asbestos, or a claim for warranty, guarantee, indemnification or contribution arising from an obligation of the Trust for the payment of a death or personal injury claim." *Findley I*, 129 B.R. at 776. To ensure that all present and future claimants received some payment, the court approved the settlement agreed on by the parties. *See id.* The court of appeals approved the use of a non-opt out class action, but remanded for the organization of subclasses. *See generally In re Joint E. & S. Dists. Asbestos Litig.*, 982 F.2d 721 (2d Cir.1992) (*"Findley II "*), *modified on reh'g*, 993 F.2d 7 (2d. Cir.1993) (*"Findley III "*).

On remand, the courts certified six subclasses—Codefendant Manufacturers, Manville Distributors, MacArthur, Present Claimants, Future Claimants, and Claimants with Pre–November 19, 1990 Settlements and Judgements. They appointed subclass representatives and approved counsel. *See In re Joint E. & S. Dists. Asbestos Litig.*, 878 F.Supp. 473, 488–89 (E. & S.D.N.Y.1995). After extensive negotiations the parties filed a stipulation of settlement in July 1994 (the "Settlement"). *See id.* at 492. In January 1995, the courts re-certified the class and subclasses and approved the amended Settlement. *See id.* at 511, *aff'd in primary part*, 78 F.3d 764 (2d Cir.1996).

Under the terms of the 1995 Settlement the rights and duties of substantially all

class members and of the Trust were governed by a new Trust Distribution Process ("1995 TDP"). *In re Joint E. & S. Dists. Asbestos Litig.*, 878 F.Supp. at 493; 1995 TDP, *attached as* Addendum A to *id.* at 580–601. The goal of the Trust remained "to treat all claimants equitably" despite the limited fund available to the Trust and the Trust's deep insolvency and consequent inability to pay all Beneficiaries in full. 1995 TDP, *supra*, section A.

In considering the viability of the 1995 TDP it was necessary to project future claims and future value of the Trust's assets. Independent estimates of future claims through 2049 were undertaken by the Trust-appointed Resource Planning Corporation and a committee appointed by the courts pursuant to Rule 706 of the Federal Rules of Evidence. *In re Joint E. & S. Dists. Asbestos Litig.*, 878 F.Supp. at 490–91. The 1995 TDP was approved on the basis of these sets of projections and the Trust's experience in settling claims through the use of such Claims Resolution Procedure factors as the industries and occupations from which the Trust had previously received claims, the division of claims between malignancies and non-malignancies, and the value of asbestos claims and settlements in the United States tort system.

The 1995 TDP provided that a claimant would be paid a *pro rata*, or equal percentage, share of his or her claim's liquidated value. In order to minimize the Trust's litigation and operating expenses and maximize the assets of the Trust available to pay compensation to claimants, the 1995 TDP almost completely removed the Trust as an active party from the tort system. It established a schedule of asbestos-related disease categories and values to enable most claims to be resolved quickly. Seven Scheduled Disease Categories were established: Bilateral Pleural Disease, Nondisabling Bilateral Interstitial Lung Disease, Disabling Bilateral Interstitial Lung Disease, Other Cancers, Lung Cancers (One), Lung Cancers (Two), and Malignant Mesothelioma. If a claim met the criteria for one of the categories, the claimant would be offered the Scheduled Value assigned to that category. The right to elect individual claim evaluation was retained.

The projections on which the 1995 TDP was based were believed to be more reliable and more comprehensive than the predictions available at the time of the Manville bankruptcy proceedings. Based on extensive analyses of the best data available at the time of the 1995 Settlement, it was expected that the New TDP would allow all Trust Beneficiaries to receive some, approximately equivalent, compensation for their claims. *In re Joint E. & S. Dists. Asbestos Litig.*, 878 F.Supp. 473, 481–84 (E. & S.D.N.Y.1995). The projections were, however, necessarily based on current information. If that information were to change substantially, the projections would no longer be accurate. It was recognized even while the 1995 TDP was being negotiated that these calculations were highly imperfect: "The settling parties acknowledge that there is inherent uncertainty in these predictions and that there is a possibility that the number of claims actually received may fall outside any projected range." *Id.* at 490.

Estimations of future Manville Trust claims have been consistently too low. *See* Transcript of Proceedings on December 13, 2001, at 45 (statement of Elihu Inselbuch, Selected Counsel for the Beneficiaries) ("Every time projections have been made they have been wrong and they have always been wrong in one direction. They have always been too low."). Provisions were made to allow adjustments to the TDP if, as has proven to be the case, the

number of future claims was higher than projected.

The *pro rata* percentage of the claims to be paid is set by the Trust in conjunction with the SCB, the Legal Representative, and the Special Advisor (the "Authorized Parties"). The 1995 TDP mandated that this percentage be periodically reevaluated to determine whether it should be increased or decreased on the basis of the Trust's assets and projected liabilities. In addition the 1995 TDP allowed the Trust, with the agreement of the SCB and the Legal Representative and after consultation with the Special Advisor, to amend the provisions of the TDP governing the "Scheduled Diseases, Categorization Criteria, and Scheduled Values ... and the Maximum Values" when necessary or desirable in light of changing conditions. 1995 TDP, *supra*, section K.1. For a more comprehensive discussion of the operation of the 1995 TDP, see *In re Joint E. & S. Dists. Asbestos Litig.*, 878 F.Supp. 473, 489–513 (E. & S.D.N.Y.1995).

### B. Post 1995 Developments

### 1. Proliferation of Asbestos Litigation and Claims

Despite the end of most industrial use in this country of asbestos some thirty years ago, the total number of asbestos lawsuits and claims against asbestos trusts and the rate at which they are being filed have increased rapidly in recent years. Claims for compensation for asbestos-related injuries have already cost businesses over 50 billion dollars through the end of 2000. It has been estimated that the cost of such claims to business will ultimately reach at least $200 billion. RAND Report 2002, *supra*, at 78 (as much as $210 billion); *see also* Bell, *supra*, at 4, n. 13 (up to $275 billion); Joseph E. Stiglitz et al., *The Impact of Asbestos Liabilities on Workers in Bankrupt Firms* 3 (American Insurance Association, 2002) (Asbestos bankruptcies

have led to the loss of 52,000–60,000 jobs, with each displaced worker losing $25,000 to $50,000 in wages over his or her career and roughly $8300 in pension losses). At least 60 companies have been driven into bankruptcy primarily by asbestos claims, with the pace of bankruptcy filings accelerating markedly in recent years. *See* RAND Report 2002, *supra*, at 71, 75; Stiglitz et al., *supra*, at 3, 10 (estimating 61 companies). There is a strong well founded fear that much of the money available will run out before all those who have and are likely to file asbestos claims under existing tort law can be compensated. *See* RAND Report 2002, *supra*, at 3.

The current acceleration has multiple inter-connected causes. Recent developments in electronic filing and other technology permit plaintiffs' lawyers to file multiple claims at almost no cost, increasing the efficiency of their fee generation. *See* Transcript Sept. 24, 2002, *supra*, at 34–35; *see also* Manville Personal Injury Settlement Trust, Third Quarter 2002. Fee revenues from earlier asbestos cases have provided substantial capital, allowing plaintiffs' lawyers aggressively to advertise widely, to conduct mass screenings of potential claimants, and to bring in more peripheral players. *See* RAND Report 2002, *supra*, at 23, 31.

Defendants are no longer confined to a core group of companies who processed asbestos or used it extensively. Increasingly claimants' lawyers have turned to other companies in pursuit of solvent defendants. They now include over 6,000 companies in virtually every type of industry in the United States. RAND Report 2002, *supra*, at 49–50. Increasing numbers of traditional asbestos defendants have filed for bankruptcy. *Id.* Defendants today include industries with little asbestos connection, such as automobile manufacturers, who used asbestos in brake linings.

*See, e.g., Jackson v. Anchor Packing Co.,* 994 F.2d 1295 (8th Cir.1993); *Clutter v. Johns–Manville Sales Corp.,* 646 F.2d 1151 (6th Cir.1981); *United States v. Midwest Suspension and Brake,* 824 F.Supp. 713 (E.D.Mich.1993); *In re Tire Workers Asbestos Litig.,* 1991 WL 195557 (E.D.Pa. 1991); *Covington v. Abex Corp.,* 1990 WL 204688 (D.D.C.1990); *DiSantis v. Abex Corp.,* 1989 WL 150548 (E.D.Pa.1989); *Lowie v. Raymark Industries,* 676 F.Supp. 1214 (S.D.Ga.1987).

Claimants are no longer primarily those who are seriously ill and dying, but have expanded to the exposed asymptomatic and those with less serious non-cancerous conditions. *See* RAND Report 2002, *supra,* at 19–21. Plaintiffs' lawyers have reached out to these new groups of asbestos plaintiffs through the use of mass media advertising and mass screening programs where exposed workers are X-rayed and diagnosed by what are said to be pro-plaintiff B–Readers. *See, e.g.,* Bell, *supra,* at 9, 34–37.

Federal Judge Charles R. Weiner, the Multidistrict Litigation ("MDL") judge for all federal court asbestos cases, has summarized recent developments in the cases before him:

> Since the original assignment of the matter in July, 1991, the number of cases has grown to approximately 105,-000. We have closed over 75,000 cases which represents more than 9,900,000 claims.... The new defendants are not necessarily manufacturers, distributors, or installers of asbestos products but are peripherally involved. With 20 to 100 or more defendants named in every case, and frequently with more than one plaintiff, this translates into a myriad of new claims.
>
> . . .
>
> From the onset, we have given priority to the claims of the very sick and to the victims with malignancies. Group set-

tlements were and are critical to the movement of these cases. We have attempted to establish registries or deferred lists of cases to husband the resources that are available in order to protect future plaintiffs who may yet become victims. . . .

> Since the inception of the MDL consolidation, we have worked with all of the attorneys to encourage them to concentrate on the cases which involve malignancies and severe asbestosis claimants, and to defer the claims of those who at present have no evidence of impairment. Many of the attorneys have followed this path. . . . We have been able to close approximately 60% of the claims and the remaining number of cases is in the area of 30,000. Agreements to close the cases have included both federal, state, and unfiled cases which grew out of a waiver of the statute of limitations by all the parties.

Letter from Judge Charles R. Weiner (Oct. 15, 2002), filed and docketed in *In re Joint E. & S. Districts Asbestos Litig.* (No. 90–3973) (E. & S.D.N.Y.) ("Judge Weiner Letter").

### 2. Functionally Unimpaired Claimants

A characterizing feature of the recent acceleration in asbestos litigation is the number of claims being filed by plaintiffs who are functionally unimpaired. From two-thirds up to 90% of all current claimants fall into this category. *See* RAND Report 2002, *supra,* at 20.

Exposure to asbestos and inhalation of asbestos fibers can lead to a variety of medical conditions. These conditions range from physiological changes detectable only through clinical testing to non-malignant but life-impairing diseases to fatal malignancies, the most serious of which is mesothelioma. Unimpaired claimants generally are at the former end of the

spectrum. Although diagnostic standards for these non-malignant, less serious asbestos-related conditions are more subjective than those for mesothelioma, other malignancies, or asbestosis, unimpaired claimants can be said to show some evidence of an asbestos-related condition. For example, a chest X-ray may show pleural thickening or pleural plaques. Pleural plaques are discrete lesions on the outer layer of the pleurae, the double membrane that surrounds the lung. Pleural thickening, also known as diffuse pleural fibrosis, is a more diffuse thickening of the pleural tissue surrounding the lung. *See* Raymond L. Murphy, Jr. et al., American Thoracic Society, *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, 134 Am. Rev. Respiratory Disease 363, 363–64 (1986); Doll & Peto, *supra*, at 2; Gunnar Hillerdal, *Pleural Lesion and the ILO Classification: The Need for a Revision*, 19 Am. J. Indus. Med. 125, 129 (1991). For additional discussion of the health hazards and injuries associated with the use of asbestos, see *Findley I*, 129 B.R. 710 (E. & S.D.N.Y.1991).

Claimants demonstrating only pleural plaques or pleural thickening are not generally affected in their daily lives. *See* Bell, *supra*, at 6 (citing Richard Doll & Julian Peto, *Asbestos: Effects on Health of Exposure to Asbestos* 2 (1985); Victor Roggli et al., *Pathology of Asbestos–Associated Diseases* 176 (1992)). In most cases, it is unlikely that they would even know of their condition in the absence of some form of testing. *See* Letter from Manville Trustees to the courts, at 4 (Dec. 5, 2001) ("[A] large share of the Trust's claimants now have 'injuries' which are imperceptible, even to themselves, without the aid of X-ray or other imaging technology."); *see also* Bell, *supra*, at 10. These claimants are, nevertheless, filing lawsuits and claims with asbestos bankruptcy trusts in increasing numbers.

The definition of impairment, and therefore the identification of the individuals who fall into this category, is not settled. *Compare* RAND Report 2002, *supra*, at vi ("Claimants are functionally unimpaired [if] ... their asbestos exposure has not so far affected their ability to perform activities of daily life."), *with* Schuck, *supra*, at 547 ("Impairment is usually defined in terms of a combination of chest x-ray and pulmonary function (breathing test) results."). Unimpaired claimants have been infrequently identified as a discrete class for purposes of record-keeping; statistics are generally kept in terms of some other more readily identifiable division, such as malignant and non-malignant claimants. Although the studies purporting to identify the percentage of unimpaired claimants have been criticized, it is not contested that a large and growing proportion of claims are made by individuals who are less seriously affected. *See* RAND Report 2002, *supra*, at 44 ("It is clear that the growth in the annual number of claims observed ... is almost entirely due to increases in the numbers of nonmalignant claims entering the system."); Stiglitz et al., *supra*, at 8; *see also* Behrens & Parham, *supra*, at 4 ("The substantial increase in the number of new asbestos claims does not correlate with either an increase in the number of individuals exposed to products containing asbestos, or with an increased prevalence in asbestos related diseases.").

Possible motives for the filing of these claims include fear on the part of claimants that they will be barred by the applicable statute of limitations should critical symptoms occur in the future and that no funds will be left to compensate them if they do not file when they first become aware of their asbestos-related condition and later develop a more serious disease. *See* Behrens, *supra*, at 343–44. The possibility of obtaining money promptly provides an incentive for lawyers and claimants to seek

out and file these types of minimal claims. *See generally* Parloff, *supra* (describing large verdicts won by less seriously injured asbestos plaintiffs). Regardless of why the claims are filed, the dramatic increase in less seriously injured claimants has focused attention on several particular issues in asbestos: diagnosis of asbestos-related conditions, projecting future claims, and compensation ratios among types of illnesses.

a. Diagnosing Asbestos-related Disease

Appropriate methods of screening for and identifying asbestos-related diseases still are unsettled. The most reliable diagnoses of asbestos-related impairment of the lungs rely on a combination of chest X-rays and pulmonary function testing, physical examinations, and review of occupational and medical history. *See, e.g.,* American Thoracic Society, *The Diagnosis of Nonmalignant Diseases* (1986) (official statement); American Medical Association, *The Respiratory System,* Guides to the Evaluation of Permanent Impairment, Ch. 5 (5th ed.2000); Bell, *supra,* at 34.

Chest X-rays have been widely accepted as one of the most valuable tools in identifying asbestos-related conditions. *See* Murphy et al., *supra.* They are evaluated on a scale developed by the International Labour Office. International Labour Office, *Revised Classification of Radiographs of Pneumoconiosis* (1980); *see also* William S. Cole, M.D., *The Classification of Radiographs of Pneumoconiosis, in A Study Syllabus for Classification of Radiographs of Pneumoconioses* (W.J. Tuddenham, M.D. ed., NIOSH April 1983) (a study guide for the application of the ILO radiographic classification system; prepared by the Division of Respiratory Disease Studies, NIOSH Centers for Disease Control and Prevention, Morgantown, W.V.). The National Institute for Occupational Safety and Health ("NIOSH") of the Centers for Disease Control and Preven-

tion ("CDC") awards B–Reader approvals to physicians who meet a specified level of proficiency in classifying chest X-rays according to the ILO scale; these B–Readers must be re-certified at 4 year intervals. Chest roentgenograms are graded according to the number of abnormalities in a given area of the chest film. An 0 corresponds to no abnormalities, 1 to slight, 2 to moderate, and 3 to ˙severe. Since this process is to some degree inherently subjective, readers give two classifications, the category that they think most likely and next most likely. The result is a 12 point scale, with results ranging from 0/0 (normal roentgenologic appearance) to 3/3 (severe abnormalities). These results are commonly called ILO readings or ILO X-ray readings.

Pulmonary function generally is tested through spirometry, a process of pulmonary measurement in which the individual breathes through a mouthpiece into a machine called a spirometer. *See* American Thoracic Society, *Standardization of Spirometry* (1994). Both FEV, forced expiratory volume in the first second, and FVC, forced vital capacity or the volume of air that can be maximally forcefully exhaled, are measured. The results are typically reported both as an absolute value and as a predicted percentage of normal. In addition, lung volume can be tested through several different methods by measuring TLC, total lung capacity or the total amount of air in the lungs after a full inspiration, and RV, residual volume or the amount of air remaining in the lungs after a full exhalation. The American Medical Association lists criteria for evaluating permanent respiratory impairment according to these measurements, including the lower limits of normal pulmonary function. American Medical Association, *supra,* at 107.

An occupational and medical history is also important in diagnosing an individual with an asbestos-related condition. Impairment of the lungs, as diagnosed through X-rays and pulmonary function testing, can be caused by a variety of factors. Pleural plaques and pleural thickening as observed in functionally unimpaired individuals resemble lung inflammations caused by a wide variety of other airborne particles. *See* Brickman, *supra,* at 4; Parloff, *supra.*

Claimants today are diagnosed largely through plaintiff-lawyer arranged mass screening programs targeting possibly asbestos-exposed workers and attraction of potential claimants through the mass media. The programs rely almost solely on chest X-rays and pro-plaintiff readers to identify the injured. *See generally* Bell, *supra,* at 35–36. There is a significant amount of controversy both over the reliability of mass screening programs in particular and over the use and accuracy of X-rays in general in identifying asbestos-related diseases. *Cf. also In re Diet Drugs,* 236 F.Supp.2d 445 (E.D.Pa.2002) (finding certifications of mitral valve regurgitation by two doctors submitted to trust by two related firms medically unreasonable).

A number of studies have shown that some plaintiffs' doctors consistently over-diagnose asbestos-related conditions. A 1990 study published in the Journal of Occupational Medicine found that only 16 of 439 claimants that filed lawsuits as a result of a 1986 mass screening of tire workers at their worksite demonstrated chest abnormalities consistent with asbestos exposure. R.B. Rerger et al., *Cases of Alleged Asbestos–Related Disease: A Radiologic Re–Evaluation,* 32 J. Occupational Med. 1088 (1990). Neutral academics retained to conduct audits by the Manville Trust found that two Trust physicians disagreed with plaintiff doctors and found either no disease or a less severe disease than claimed in approximately 41% of the audited cases. A.R. Localio et al., Biostatics Section, Dept. of Health Evaluation Services, Penn. State Univ. College of Medicine & Center for Clinical Epidemiology and Biostatics, *The Manville Personal Injury Settlement Trust X–Ray Audit: An Assessment of the Identification of the Underlying Disease Process Implications for Medical Review by Certified B–Readers* (1998). On-going audits conducted by the Trust concluded that in the first quarter of 1998 the "failure rate" of the ten doctors who provided X-ray interpretations for 87% of the claims received by the Trust was 59%. Memorandum from Patricia Houser to Manville Trustees (May 13, 1998). *See generally* Bell, *supra,* at 13–16. It should be pointed out that the B–Readers' reports of those criticizing plaintiffs' experts were sometimes inconsistent among themselves and furnished no gold standard for diagnoses. The process is intrinsically subjective at the margins.

Probable over-diagnosis is related to a larger problem concerning the accuracy of X-rays in screening for asbestos-related injury. *See, e.g.,* Parloff, *supra* ("Incipient or marginal asbestosis, as picked up on an X-ray, bears at least a superficial resemblance to more than 130 other lung inflammations, including scores caused by various airborne particles."). It is particularly difficult to diagnose the less severe manifestations of an asbestos-related injury on the basis of an X-ray alone. *See* Murphy et al., *supra* ("The problem is that the interpretation of the lesser degrees of abnormality on [the ILO] scale is subjective and that numerous causes of such roentgenologic shadowing other than asbestosis exist. In the presence of marked diffuse pleural thickening, it is difficult to diagnose or grade the severity of interstitial fibrosis.").

A medical surveillance program using spiral CT scanning technology has been proposed as one alternative to the current mass X-ray screening procedures. *See* Steven Kazan, Memorandum of Interested Attorney (Dec. 7, 2001) ("Kazan Memo. of Dec. 7, 2001"), at 6–8. The specifics of such a program have not yet been completely detailed, including who would be responsible for running it, but the concept can be generally sketched. Spiral CT, or computed tomography, scanning involves a computerized assimilation of multiple X-ray images to create a two dimensional cross-sectional image. *See Stedman's Medical Dictionary* (27th ed.2000). It can reveal abnormalities in lung tissue that would not be shown by a conventional X-ray. Recent studies have suggested that a well designed program of spiral CT scanning for significantly asbestos-exposed workers could detect lung cancer early enough to possibly permit cure of a substantial percentage of the cases. *See* Kazan Memo. of Dec. 7, 2001, *supra,* at 7 (citing Paul Brunetta, *Early Detection of Lung Cancer,* Mealey's Asbestos Conference 1999, at 67–73 (1999); Gordon Gamsu, *Recent Developments in Spiral CT Scanning,* Mealey's Asbestos Conference 2000, at 107–114 (2000); Claudia I. Henschke et al., *Early Lung Cancer Action Project: Initial Findings on Repeat Screening,;* Annette McWilliams et al., *Combination of Computer–Assisted Sputum Analysis and Low–Dose Spiral CT Scan for Lung Cancer Screening,;* Albert Miller & Steven Markowitz, *Screening for Early Lung Cancer in High–Risk Workers Exposed to Asbestos and Radiation,*); Steven Kazan, Memorandum of Interested Attorney (Aug. 30, 2002) ("Kazan Memo. of Aug. 30, 2002"), at 3–4 (citing J.H. Austin et al., *CT Screening for Early Stage Lung Cancer,* 121 Chest 1725–26 (May 2002); T. Nawa et al., *Lung Cancer Screening Using Low–Dose Spiral CT: Results of Baseline and 1–Year Follow-up Studies,* 122 Chest 15–

20 (July 2002)). Given the lack of current treatment options for mesothelioma and asbestosis, an earlier diagnosis, while allowing earlier compensation, might not make a greater number of cures of the most serious cases possible. *See* Parloff, *supra.*

There is substantial controversy surrounding the possibility of wide use of CT technology. There may be insufficient data to conclude that CT scanning provides a more accurate method of diagnosing asbestos-related conditions across the board. Substantial questions exist as to whether the use of CT scanning would be efficient and cost-effective. Further study on how best to structure a comprehensive CT screening program is necessary. As discussed below in Section IV.C.1., *infra,* there are significant gaps in the medical data available concerning the diagnosis of asbestos-related injuries generally. Further exploration and research in this area is needed.

b. Projecting Future Claims

Calculation of estimates of future asbestos claims remains difficult. The federal government began strictly regulating workplace exposure to asbestos in the 1970s. *See* Section II.A.1, *supra; Findley I,* 129 B.R. 710, 737 (E. & S.D.N.Y.1991). These regulations became increasing stringent over time, with most uses of asbestos banned today. *See, e.g.,* 40 C.F.R. § 61.01 (2002) (EPA emission standards for hazardous air pollutants, including asbestos); 29 C.F.R. § 1926.1101 (2002) (OSHA standards on asbestos in construction); 29 C.F.R. § 1915.1001 (2002) (OSHA standards on asbestos in shipyards); 29 C.F.R. § 1910.1001 (2002) (OSHA standards on asbestos in general industry). Some manufacturers, among them Johns–Manville, continued to produce and sell asbestos and products containing asbestos into the

1980s. *See* Letter of David Austern, general counsel of the Manville Trust, to Julie Davis, Esq. and other interested parties, at 2 (July 24, 2001) ("Austern Letter of July 24, 2001") (Manville stopped making products containing asbestos in 1983, despite different statements made by the company during bankruptcy proceedings); Issacharoff, *supra*, at 1925. Given the lengthy latency period for many asbestos-related diseases asbestos litigation can be expected to continue for some decades to come. *See, e.g.,* Issacharoff, *supra*, at 1925; Manville Personal Injury Settlement Trust Reports, Fourth Quarter 2001.

There are two important variables in calculating the number of future claims that can be expected: first, identifying epidemiologically the number of people who will suffer from diseases related to asbestos exposure in the future, and second, identifying the subset of those injuries that will result in claims. *See also* Issacharoff, *supra*, at 1939 ("much turns on the accuracy of projections of future claims").

Future malignancy, and particularly mesothelioma claims can be predicted with a fair amount of accuracy. The effects of asbestos on lung function seem to be related to the quantity and concentration of asbestos fibers to which an individual was exposed, with more serious injury resulting from greater exposure. *See* Murphy et al., *supra* (citing several studies); RAND Report 2002, *supra*, at 47–48. Mesothelioma and asbestos-related lung cancers are expected to result primarily from the sort of direct occupational exposure that was phased out as a result of increasingly stringent federal regulation. Despite the lengthy latency period for these diseases—15 to 40 years—the number of mesothelioma and other malignancy claims can reasonably be expected to be declining. *See* James S. Kakalik et al., RAND Institute for Civil Justice, *Variation in Asbestos Litigation Compensation and Expenses* (1984), *cited in* Behrens, *supra*, at 337, n. 26. While malignancy claims are not yet exhausted, the potential universe of malignancy claims is no longer expanding.

Even asbestosis has been described as a "disappearing disease". *See* W. Raymond Parkes, *Occupational Lung Disorders* (3rd ed.1994), *quoted in* Parloff, *supra*. The total universe of possible non-malignancy claims, however, is expanding so rapidly that it is difficult currently even to reliably estimate its limits. The rise is apparently due primarily to claims brought by unimpaired claimants. *See generally* Behrens, *supra*, at 336, 342–44 ("[T]he recent explosion of filings by unimpaired claimants has been the 'wild card' that has caused earlier estimates of the litigation to be so far off the mark."). First, a lack of data concerning this type of claim makes future projections particularly difficult. *See, e.g.,* Hensler, *supra*, at 1923 (2002) ("We can only dimly perceive what the future of the 'futures' will be from the experience of the past few years."); Issacharoff, *supra*, at 1939 ("Each of the attempts [to solve the asbestos crisis] thus far failed, or is threatened with failure, because of the inability to control the volume and quality of future claims."). Not only are these claims arising out of an ever-expanding group of industries not involved directly in the manufacture or distribution of asbestos, there is currently insufficient medical data concerning their diagnosis to predict how many individuals are and will be affected by and diagnosed with such impairment.

Even if an accurate prediction of the number of individuals who will suffer future non-malignant asbestos-related injuries could be made, claiming behavior for nonmalignant as opposed to malignant claims is more susceptible to economic and other non-epidemiological factors, making the number of future nonmalignant claims

extremely difficult to project. A critical factor, for example, is the cost to lawyers of bringing the claims as compared to the fees they can expect to earn. A substantial driving force behind expanding claims is the ease of generating claims through extensive advertising in print, radio, and television and mass X-ray screenings. Costs of processing a claimant's allegations against many defendants is greatly reduced by electronic multiple filing techniques.

Were fee percentages reduced or cost of processing by plaintiffs' lawyers substantially increased by demanding more expensive demonstrations of disease, claims for nonmalignant disease might plummet. Such an approach would arguably be counter to traditional American policy of reducing barriers to prosecution of valid legal claims. In view of the need to protect relatively blameless defendants and to insure adequate compensation for the more seriously injured, as well as to protect integrity of the process, more stringent medical standards seem warranted.

Advertising and the use of technology and large scale operations by lawyers to improve efficiency and provide service to a large community—here those exposed to asbestos, injured and with a recognized substantive cause of action—is generally considered commendable under our capitalistic-entrepreneurial regime and ethical under our professional-legal system. *See, e.g., Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); American Bar Association Model Rules of Professional Conduct Rule 7.2; N.Y.Code of Professional Responsibility DR 2–101 (McKinney 2001); Stephen Gillers & Roy D. Simon, Jr., *Regulation of Lawyers: Statutes and Standards* 398, 968 (2002 ed.); Richard A. Zitrin & Carol M. Langford, *Legal Ethics in the Practice of Law* 746–56 (2d ed.2001).

#### c. Compensation Ratios

The rise in unimpaired claimants has focused attention on the relative values paid to unimpaired, non-malignant, and malignant claims in the tort system. The ratio of amounts awarded to individuals suffering from asbestosis to amounts awarded to individuals suffering from mesothelioma has changed significantly in recent years. In 1995 that relationship, as reflected by the ratio between the Scheduled Values under the Manville Trust 1995 TDP for Disease Categories 3 (the highest non-malignancy category) and 7 (mesothelioma), was approximately 1 to 4. Preliminary research shows the torts and trusts ratios today are between one to thirteen and one to more than 30. *See* Letter of Mark Peterson (Dec. 13, 2001). When the admittedly low 1 to 4 ratio is magnified by the drastic rise in less seriously injured claimants, the result is an enormously disproportionate allocation of funds to the unimpaired.

Claims filed by those who are not, or not yet, functionally impaired reduce the already limited funds available to compensate those who are seriously injured. The risk that funds will be exhausted has been somewhat reduced by what are probably decreasing transaction costs. Transaction costs (including plaintiff and defendant expenses) have reportedly consumed more than half of total spending on asbestos compensation. RAND Report 2002, *supra,* at 60–61; *see also Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 598, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("[T]ransaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether." (internal quotation and citation omitted)). As reflected in increased efficiency in claims processing of the Manville Trust, relative transaction costs have come

down. Defense counsel fees have been reduced since so many claims are now handled by trusts administratively without resort to litigation. Plaintiff lawyers' fees remain relatively high except when sharply limited as in the Manville 1995 and 2002 TDPs.

Many workers can properly allege that they were exposed to many different manufacturers' products. The number of suppliers of asbestos to whose products exposure arguably occurred is increased greatly by the transient nature of the work of so many of the claimants. Electronic production of papers for multiple claims against many potential defendants and trusts, with cheap electronic filing in courts and trusts all over the country, has substantially increased the leverage of the plaintiffs' bar. The fact that trusts such as Manville pay only 5% or 10% of the approved claim is offset in many instances by the fact that the claimant will obtain compensation from many sources. *See, e.g.,* RAND Report 2002, *supra,* at 40–41 (typical claimants today name 60 to 70 defendants); Judge Weiner Letter, *supra* (75,000 cases with 9,900,000 claims).

### 3. Manville Trust

About July of 2000, the Manville Trust began to experience a dramatic and unanticipated rise in the number of claims being filed and expansion in scope of the industries and occupations which generated those claims. Over the last two years, that trend has continued.

At the time of the bankruptcy proceedings in 1988, it was projected that the Trust would receive between eighty-three thousand and one hundred thousand claims over the life of the Trust. *See* Transcript Dec. 13, 2001, *supra,* at 9. This proved to be a gross under-estimate. In 2000 and 2001 alone, the Trust received, respectively, 59,2000 and 91,000 new claims. Manville Personal Injury Settlement Trust Reports, Fourth Quarter 2000; Manville Personal Injury Settlement Trust Reports, Fourth Quarter 2001. In those two years alone, the number of claims filed exceeded the maximum number of total claims originally projected. As of September 30, 2002, a total of 580,414 claims had been filed with the Trust since its inception. Manville Personal Injury Settlement Trust Reports, Third Quarter 2002. Current Manville claim forecasts place the number of claims at from a million and a quarter to more than three million during the lifetime of the Trust. *See* Transcript Dec. 13, 2001, *supra,* at 13–14; *see also* Issacharoff, *supra,* at 1932.

An increasingly large percentage of the claims received by the Trust in recent years result from alleged asbestos exposure from industries such as non-asbestos manufacturing, textiles, paper and pulp, glass, durable metals, and others where Manville asbestos might have been present in sufficient quantity in the factories, or facilities of industries using asbestos, to contribute to asbestos-related disease. Transcript Dec. 13, 2001, *supra,* at 23–25; *see also* RAND Report 2002, *supra,* at 14–15; William J. Nicholson et al., *Occupational Exposure to Asbestos: Population at Risk and Projected Mortality 1980–2030,* 3 Am. J. Industrial Medicine 259 (1982). In the first half of 2001, over 30% of the claims received by the Trust were non-asbestos manufacturing and textile claims, sometimes described as "ambient air" claims. Austern Letter of July 24, 2001, *supra,* at 2. Under the 1995 TDP, it was difficult for the Trust "to police these ambient air claims vigorously" to ensure actual occupational asbestos exposure. *See id.* Claims resulting from occupational exposure less direct than that which tends to occur in asbestos manufacturing are likely to be less serious. *See* Section II.B.2, *supra.*

The Manville Trust experienced a sharp rise in the number of non-malignant claims; this increase was evident both in the number of non-malignancy as compared to malignancy claims filed and in the ratio of dollars paid to non-malignancy relative to malignancy claims. Non-malignant claims are those that fall into one of the first three scheduled disease categories under the 1995 TDP—Bilateral Pleural Disease, Nondisabling Bilateral Interstitial Lung Disease, and Disabling Bilateral Interstitial Lung Disease. Statistics for the Manville Trust are discussed in terms of non-malignant vs. malignant claims as opposed to unimpaired vs. impaired claimants. Under the 1995 TDP, medical reports stating that the claimant suffered a medically observable injury were required; it is difficult if not impossible to determine on the basis of the information required to be submitted to the Trust the percentage of claimants who did or did not suffer impairment in their daily lives. *See* Transcript Dec. 13, 2001, *supra*, at 21–22.

The category of non-malignant claims is not co-extensive with that of unimpaired claimants. Among other differences, non-malignant claims cover those suffering from asbestosis, a chronic, often debilitating, and potentially fatal disease involving scarring the tissues of the lungs themselves and causing shortness of breath, coughing, fatigue, feelings of sickness and possible respiratory or cardiac failure. *See* Murphy et al., *supra;* 29 C.F.R. § 1910.1001, app. H, sec. III (2002) (OSHA medical surveillance guidelines); RAND Report 2002, *supra*, at 17.

From 1995 until 1999, 88 percent of claims filed with the Trust were based upon non-malignancies. In 2001, that statistic had increased to 94%. The percentage of payments being made by the Trust to settle non-malignant claims as opposed to the most serious asbestos-related injuries also increased significantly. Prior to the adoption of the 1995 TDP and for the first five years of experience under it, claimants suffering from asbestos-related cancers received approximately 44% of Trust claims settlement payments (56% to non-malignancies). Since 2000 that percentage has sunk to 24% (76% to non-malignancies). *See* Response to the Submissions of the Unofficial Committee of Select Asbestos Claimants ("SAC"), the Solvent Co–Defendants and Steven Kazan, at 6 (Oct. 4, 2002). The 1995 TDP proved inadequate to deal with this unexpected change in circumstances.

The increase in claims made it increasingly likely that the Trust would have insufficient funds to continue paying even the 10% of the liquidated value of all claims it had been paying since 1995. The Trustees' responded by reducing the *pro rata* share from 10% to 5% in June of 2001. *See* Manville Personal Injury Settlement Trust Reports, Third Quarter 2002. Although the SCB and the Legal Representative contested this decision, it was agreed to go forward with the reduction on an interim basis until an appropriate long term *pro rata* share could be determined. Accordingly claimants have been paid 5% of the liquidated value of their claims since June 2001. *See* Memorandum Re: Manville Trust TDP Changes and the Status of the Pro Rata Share Review (Sept. 12, 2002), *available at* http://www.mantrust.org ("Pro Rata Share Memo."); Transcript Dec. 13, 2001, *supra*, at 11.

In November of 2001, the courts issued an order directing all interested persons to appear for a hearing in December of that year to consider "whether the equities involved and changed circumstances warrant or permit modifications of any relevant prior judgments." *In re Joint E. & S. Dists. Asbestos Litig.*, 2001 WL 1464362 (E.D.N.Y.2001). The courts took note of

the recent trends, including the continuing rise in claims, the reduction in the *pro rata* amount paid on claims, and the plaintiffs' lawyers' media campaigns and other considerations encouraging a flood of new claims. They suggested that there might be "a misallocation of available funds, inequitably favoring those who are less needy over those with more pressing asbestos-related injuries." *Id.*

The courts heard interested parties, including David Austern, general counsel to the Manville Trust; Elihu Inselbuch, Selected Counsel for the Beneficiaries; Leslie Fagan, for the future claimants; Steven Kazan, a prominent asbestos plaintiffs' lawyer who focuses on the representation of seriously injured claimants; Mark Iola, on behalf of the Unofficial Committee of Select Asbestos Claimants, a group of law firms which represent primarily seriously injured asbestos claimants; Fred Baron, also for Selected Counsel for the Beneficiaries; Perry Weitz, of Weitz & Luxenberg, P.C.; Roger Podesta, for Owens–Corning and Fibreboard, originally among the solvent Co-defendants; and Joe Rice, of Ness Motley, P.A. Extensive data concerning the operation of the Trust and contemporary contours of the asbestos problem generally were presented. The focus of the hearing was on the need to amend the Trust distribution process so as to best allocate its limited resources.

The courts requested and received a series of reports from the Trust and other parties on the progress made toward modifying the TDP payment schedule. As a result of arms-length negotiations, the Authorized Parties reached agreement on changes to the 1995 TDP announced and described at a hearing on September 4, 2002. The Trust Distribution Process as amended by these changes is referred to as the 2002 Trust Distribution Process ("2002 TDP"). It is on file in these proceedings.

## C. Trust Payments to Date

As of the end of November 2002 the total payments by the Trust are summarized in the chart below. Detailed year by year claims and payments are provided in summaries filed and docketed with this memorandum.

*Claims Paid to November 30, 2002*

| | Claims Filed | Total Amount Paid | Average Value Claims Paid |
|---|---|---|---|
| Mesothelioma | 21,678 | $ 642,319,866 | $207,005 |
| Lung Cancer 2 | 29,433 | $ 403,630,247 | $ 89,472 |
| Lung Cancer 1 | 4,988 | $ 45,755,483 | $ 78,601 |
| Other Cancer | 6,742 | $ 30,726,166 | $ 46,369 |
| Subtotal Cancer | 62,841 | $1,122,431,762 | $124,530 |
| Disabling Asbestosis | 178,716 | $1,159,839,671 | $ 48,878 |
| Nondisabling Asbestosis | 169,507 | $ 398,912,826 | $ 25,104 |
| Pleurals | 92,801 | $ 169,575,528 | $ 12,426 |
| Other | 967 | $ 28,730,399 | $ 39,799 |
| Subtotal Non-malignancy | 441,991 | $1,757,058,424 | $ 32,087 |
| Total | 504,832 | $2,879,490,186 | $ 43,594 |

## III. Law

### A. Power to Amend the Trust Distribution Process

The 1995 TDP was part of a court-approved class action settlement. *See In re Joint E. & S. Dists. Asbestos Litig.,* 878 F.Supp. 473, 485–512 (E. & S.D.N.Y.1995), *aff'd in primary part,* 78 F.3d 764 (2d Cir.1996); *see also* Section II.A.2, *supra.* Under the 1995 TDP, the Trust, the SCB, and the Legal Representative, after consultation with the Special Advisor, have the power to amend the TDP provisions governing the *"pro rata* share, the Scheduled Diseases, Categorization Criteria, and Scheduled Values . . ., and the Maximum Values . . . to reflect changed circum-

stances, greater information and/or improved procedures." 1995 TDP, *supra*, section K. Other provisions of the Trust (except as provided in section H, granting concurrence or consultation rights for the Co–Defendant Manufacturers Subclass and the Manville Distributors Subclass in certain circumstances when their rights under the Trust are affected) may be amended for the same reasons pursuant to the agreement of the Trust and the SCB after consultation with the Special Advisor. *Id.*

Action by the Authorized Parties is justified if and when unforeseen circumstances cause the TDP to operate inequitably. If they fail to act appropriately, the courts may require necessary modifications to the Trust distribution process under Federal Rules of Civil Procedure 60(b)(5) and (6).

█ The purpose of Rule 60(b) generally is to preserve "a balance between serving the ends of justice and preserving the finality of judgments." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir.1986), *cited in Paddington Partners v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir.1994). Rules 60(b)(5) and (6) state: "On motion and upon such terms as are just, the court may relieve a party ... from a final judgment ... [if] it is no longer equitable that the judgment should have prospective application; or [for] any other reason justifying relief." Fed.R.Civ.P. 60(b) (2002). The Rules are based on the historic equitable power of the court to modify its decree in light of changed circumstances. *See United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999; 11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2863 (2002) ("Wright & Miller"). Power to grant relief from a judgment is not limited to injunctive relief, or to relief that would have been granted in the courts of equity, but applies to any judgment with prospective effect. *See* 11 Wright & Miller, *supra*, § 2863; *Ryan v. U.S. Lines Co.*, 303 F.2d 430, 434 (2d Cir.1962). The authority has been exercised to modify as well as to vacate judgements. *See, e.g., Davis v. New York City Housing Authority*, 278 F.3d 64, 88 (2d Cir.2002); *New York State Ass'n for Retarded Children Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257; *Independent Living Aids, Inc. v. Maxi–Aids, Inc.*, 208 F.Supp.2d 387, 394–95 (E.D.N.Y.2002) (modifying a judgement for permanent injunctive relief which failed to prevent defendant's trademark infringement as intended). Rule 60(b) applies to judgments no longer equitable because the operative facts underlying the judgement have changed. *See* 11 Wright & Miller, *supra*, § 2863; *Plyler v. Evatt*, 846 F.2d 208, 211 (4th Cir.1988) ("[T]he unanticipated increase in population clearly is a change in operative facts which meets [the Rule 60(b)(5)] predicate for modification.").

█ A strong showing is required before any judgment will be modified. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("[A] party seeking modification ... bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance."). Action by the courts would seem be justified under circumstances like those which currently exist where the flood of unimpaired claimants in combination with other factors has caused a serious misallocation of available funds, favoring the less seriously injured and risking premature exhaustion of the Trust's limited funds. *Cf. In re Joint E. & S. Dists. Asbestos Litig.,*

878 F.Supp. 473, 529 ("New York courts have explicitly recognized the principle that a court may act equitably in the case of an emergency or unforeseen circumstances to prevent frustration of the trust's purpose by authorizing deviations."); *cf. also id.* at 569.

Amendments, alterations, and adjustments to the TDP are made in the context of prior proceedings, orders, agreements, and judicial approval of those agreements in the long complex history of litigation involving Manville and the Manville Trust. The purpose of the Trust always has been to use its limited assets to compensate bona fide Manville asbestos victims in the most fair, adequate, and equitable manner possible. The Authorized Parties, or in the absence of action by those parties the courts, must act to advance this goal, and must act in the manner prescribed by the Trust. This means, in particular, that any amendments to the TDP must serve to "treat all claimants equitably" and must take account of evolving asbestos litigation in the tort system. 1995 TDP, *supra*, section A; *see In re Joint E. & S. Dists. Asbestos Litig.*, 878 F.Supp. 473, 495 (1995); 1995 TDP, *supra*, section C. Looking to the "tort system" as a model has become both more difficult and less meaningful as a result of the increasing diversity of state tort law and in particular on claims made by functionally unimpaired claimants.

### B. Claims by Functionally Unimpaired Claimants

There is substantial debate among all interested parties about how non-disabling claims should be handled. The primary goal is to preserve resources for seriously injured claimants while providing some compensation to all those who are entitled. There are several facets of the debate on how best to achieve this goal.

First is the question of whether, as a matter of law, claims brought by individuals who show clinical evidence of an asbestos-related condition are actionable and on what grounds. Under the rule of *Erie* state tort law governs whether individuals showing clinical evidence of such asbestos-related conditions as pleural plaques or pleural thickening have actionable claims in the absence of functional impairment. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *cf. also Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 19, 23–25, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) (Bankruptcy courts "may reorder distributions from the bankruptcy estate, in whole or in part, for the sake of treating legitimate claimants to the estate equitably. But the scope of a bankruptcy court's equitable power must be understood in the light of the principle of bankruptcy law ... that the validity of a claim is generally a function of underlying substantive law."). There are several general classes of claims that may be brought by such unimpaired claimants. Courts may recognize clinical evidence of changes in an individual's lungs as an injury in and of itself. *See, e.g.,* Behrens, *supra*, at 342–43. Some state courts also may recognize claims of fear of future illness, such as cancer, or medical monitoring claims brought by individuals who have been exposed to asbestos. *See generally* Henderson & Twerski, *supra*.

Jurisdictions vary significantly on whether any or all of these types of claims are cognizable. Under the law of many states, it is not clear whether or on what grounds and at what point an unimpaired claimant has a compensable claim. *Compare* Unofficial Committee of Select Asbestos Claimants Supplemental Memorandum on SCB Proposed Trust Modifications, *In re Joint E. & S. Dists. Asbestos Litig.*, (90 CV 3983) (Sep. 25, 2002 E.D. & S.D. N.Y.), *with* SCB's Supplemental Response to

Memoranda Regarding Amendments to the Manville TDP, *In re Joint E. & S. Dists. Asbestos Litig.*, (90 CV 3983) (Oct. 4, 2002 E.D. & S.D. N.Y.). *See also* Henderson & Twerski, *supra*, 818, *passim* (arguing that "preinjury" claims brought by plaintiffs exposed to asbestos for increased risk, negligent infliction of emotional distress, and medical monitoring are "radical departures from longstanding norms of tort law" and should not be recognized); RAND Report 2002, *supra*, at 19–20.

 If claims are substantively valid under state law they may not be effectively denied by indefinite postponement without violating the rule of *Erie*. It would be appropriate, however, to reduce the ratio of compensation paid to unimpaired claimants to reflect the gravity of their injury.

Second, there is dispute over the type and quality of medical and other evidence sufficient to show a medically recognizable disease resulting from asbestos exposure. As noted by Elihu Inselbuch, counsel to the SCB, at the September 4, 2002 hearing:

> On the one hand though, while we have to respect any claim that can state a cause of action under state law, we have to be very careful to make certain that the proof we require of that claim would get that claim to the jury in the tort system, and that the values that we ascribe to each of the claims are what, as a result, defendants and plaintiffs would settle for outside of court.

Transcript Sept. 4, 2002, *supra*, at 29. Just what proof is necessary to meet this ongoing tort litigation standard is debatable. *See* Section II.B.2.a, *supra* (discussing the debate over the use and evaluation of X-rays and CT scans in diagnosing asbestos-related conditions).

Finally, there is a question of policy. Accepting arguendo that non-impaired claimants are legally entitled to compensa-

tion, in light of the near certainty that the funds available now and in the future will be insufficient to fully and adequately compensate all possible claimants, should available funds be preserved, or at least used primarily, to compensate the most seriously injured? Related to this issue is the limited capacity of the courts and the heavy burden placed on the judicial system and bankruptcy trusts by the volume of asbestos claims. Further complicating an appropriate solution is the potential effect of statutes of limitations if claims brought by unimpaired claimants are dismissed or deferred; the applicable state statute of limitations may bar these claims, even for claimants who do ultimately develop a serious asbestos-related disease unless it is tolled or defined as beginning to run as of the date of diagnosis of the more serious malady.

Courts and trusts have taken varying approaches in response to the recent rapid rise in claims brought by unimpaired individuals. For example, in the multi-district litigation Judge Weiner, as already noted, has held inactive without prejudice, with the tolling of applicable statutes of limitations, non-malignant cases until the claimants show evidence of an asbestos-related debilitating condition. *See* Administrative Order No. 8, *In re Asbestos Prods. Liab. Litig.* (No. MDL 875) (E.D.Pa. Jan. 16, 2002). The result has not been to staunch the flow of unimpaired claimants, but rather to divert most cases to state courts and existing trusts, and particularly to those jurisdictions seen as particularly sympathetic to asbestos plaintiffs. *See* RAND Report 2002, *supra*, at 32–37.

Some bankruptcy courts have considered denying voting rights to individuals not able to provide objective medical evidence of impairment in their daily lives. In effect this would cut non-disabling cases off from effective claims in bankruptcy.

*See, e.g.,* Debtors' Motion for a Declaration with Respect to Voting Rights of Certain Putative "Claimants", *In re USG Corp et al.* (No. 01–2094) (Aug. 21, 2002 Bankr.D. Del.). Other courts have established deferral registries for non-disabling claims, allowing these claims to proceed only when medical evidence of impairment can be shown, or have placed the more serious cases on a fast track. *See generally, e.g.,* Behrens & Parham, *supra*; Rothstein, *supra*. Still others have construed state substantive laws to exclude some or all classes of claims commonly brought by unimpaired claimants. Behrens, *supra,* at 345–46; Professor Aaron D. Twerski, Statement at Symposium, "Asbestos What Went Wrong," held at the Bar Association of the City of New York (Oct. 21, 2002). One court has focused on defendants, construing state tort law to reduce the burden on jointly liable defendants. *See* Cerisse Anderson, *Asbestos Ruling Favors Solvent Defendants,* N.Y.L.J., Nov. 4, 2002, at 1 (New York Supreme Court Justice Helen Freedman construes apportionment of liability to protect solvent defendants). *See generally* Rothstein, *supra.*

An available response for a trust would be to increase the ratio of payment made to those with more serious diseases, that is, mesothelioma or other malignancies, to payment made to non-malignant or unimpaired claims. Even those members of the plaintiffs' bar who oppose exclusion of non-disabling claims have generally agreed to the appropriateness and value of this approach. Such a shift in ratios would help remedy the current misallocation of funds resulting in part from the rise in unimpaired claimants. It would be appropriate at the same time for a trust, in reliance on the best medical data currently available, to tighten up the criteria for proving an asbestos-related disease. Although the combination of these two steps would not eliminate the opportunity for fraud or exaggeration of dubious claims, it would reduce the likelihood that fraudulent or exaggerated claims would be successful, and thus it would help to preserve funds for more seriously injured claimants.

## IV. Application

### A. Amendment of the Manville Process

■ Current circumstances—namely the dramatic recent increase in claims, differences in the qualitative character of the claims now being brought, and changes in relative values of claims in the tort system—are unforeseen circumstances justifying action by the Authorized Parties. *Cf. In re Joint E. & S. Dists. Asbestos Litig.,* 878 F.Supp. 473, 529 (E. & S.D.N.Y. 1995). As already noted, *see* Section II. B.3, *supra,* the Authorized Parties have acted to amend the Manville Trust's distribution process. The result is the 2002 TDP.

#### 1. Changes in the 2002 Trust Distribution Process

■ The main amendments in the 2002 TDP are changes to the scheduled disease categories, the values assigned to those categories and the ratio between those values, and the criteria that a claim in each category must meet. *See* 2002 TDP, *supra,* section D. Another significant alteration is the addition of evidentiary requirements that a claimant must meet in order to receive an offer of an award. *Id.,* section E. Changes were also made to provisions of the TDP pertaining to the *pro rata* share and increases or decreases to it, *id.,* secs. A, H.1.(a), H.2.(a); deactivation of claims, *id.* section B.2.(b); arbitration procedures, *id.,* section B.2.(d); concurrence of the Legal Representative, *id.,* secs. C.1, C.7, C.9; claimant's jurisdiction, *id.,* section C.3; claims liquidated after November 19, 1990, *id.,* section C.5; second malignant injury claims, *id.,* section C.6; Exigent Health and Extreme Hardship Claims, *id.,* section C.10; and Trust

Beneficiaries and Indemnification Liabilities, *id.*, section I. A provision requiring that the Trust notify claimants whose claims will be processed in the near future was eliminated. 1995 TDP, *supra*, section B.1. A final section on transitional procedures was added to ensure the continued smooth and equitable functioning of the trust. *See* 2002 TDP, *supra*, section M. The most important of these changes are addressed below.

a. Scheduled Disease Categories and Values

Set out below is the critical portion of the 2002 TDP changes from the 1995 TDP.

### MANVILLE TRUST 2002 TDP
### SCHEDULE OF ASBESTOS-RELATED DISEASE CATEGORIES AND VALUES

| Level | Scheduled Disease | Scheduled Value | [Maximum Value |
|---|---|---|---|
| I | Other Asbestos Disease (Cash Discount Payment) | $ 600 | $ 600 |
| II | Asbestosis/Pleural Disease | $ 12,000 | $ 30,000 |
| III | Asbestosis/Pleural Disease | $ 25,000 | $ 40,000 |
| IV | Severe Asbestosis Disease | $ 95,000 | $400,000 |
| V | Other Cancer | $ 45,000 | $200,000 |
| VI | Lung Cancer (One) | None | $ 50,000 |
| VII | Lung Cancer (Two) | $ 95,000 | $400,000 |
| VIII | Mesothelioma | $350,000 | $750,000] |

*Categorization Criteria.* The criteria that a claim must meet to receive an offer for the Scheduled Value for one of the eight Scheduled Disease categories are as follows:

*Level I: Other Asbestos Disease (Cash Discount Payment) (Scheduled Value: $600)*

1. Diagnosis of a Bilateral Asbestos–Related Nonmalignant Disease or an asbestos-related malignancy (except mesothelioma), and

2. Exposure to Manville asbestos products prior to December 31, 1982.

*Level II: Asbestosis/Pleural Disease (Scheduled Value: $12,000)*

1. Diagnosis of a bilateral Asbestos–Related Nonmalignant Disease, and

2. Six Months occupational exposure to Manville asbestos products prior to December 31, 1982, plus five years cumulative occupational exposure to asbestos.

*Level III: Asbestosis/Pleural Disease (Scheduled Value: $25,000)*

1. Diagnosis of asbestosis with ILO of 1/ or greater or asbestosis determined by pathology, or bilateral pleural disease of B2 or greater, plus (a) TLC less than 80%, or (b) FVC less than 80% plus FEV1/FVC ratio greater than or equal to 65%,

2. Six months occupational exposure to Manville asbestos products prior to December 31, 1982 plus Significant Occupational Exposure to asbestos, and

3. Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary condition in question.

*Level IV: Severe Asbestosis (Scheduled Value: $95,000)*

1. Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathology, plus (a) TLC less than 65% or (b) FVC less than 65% plus FEV1/FVC ratio greater than 65%

2. Six months occupational exposure to Manville asbestos products prior to December 31, 1982, plus Significant Occupational Exposure to asbestos, and

3. Supporting medical documentation establishing asbestos exposure as a contributing factor in causing condition in question.

*Level V: Other Cancer (Scheduled Value: $45,000)*

1. Diagnosis of a primary colorectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos–Related Nonmalignant Disease,

2. Six months occupational exposure to Manville asbestos products prior to December 31, 1982, plus Significant Occupational Exposure, and

3. Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question.

*Level VI: Lung Cancer (One) (Scheduled Value: None)*

1. Diagnosis of a primary lung cancer,

2. Occupational exposure to Manville asbestos products prior to December 31, 1982, and

3. Supporting medical documentation establishing asbestos exposure as·a contributing factor in causing the lung cancer in question.

Lung Cancer (One) (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer (Two) (Level VII) claims. All claims in this Disease Level will be individually evaluated. The estimated anticipated average of the

individual evaluation awards for this category is $40,000, with such awards capped at $50,000. . . .

*Level VII: Lung Cancer (two) (Scheduled Value: $95,000)*

1. Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos–Related Nonmalignant Disease,

2. Six months occupational exposure to Manville asbestos products prior to December 31, 1982, plus Significant Occupational Exposure to asbestos, and

3. Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.

*Level VIII: Mesothelioma (Scheduled Value: $350,000)*

1. Diagnosis of mesothelioma and

2. Credible evidence of exposure to Manville asbestos prior to December 31, 1982.

TDP 2002, *supra,* section D.

The New TDP increases the number of Scheduled Disease Categories from seven to eight. The structure of priority remains in place, with categories assigned a scheduled value along a sliding scale of relative severity and relationship to asbestos exposure. Generally speaking, categories of non-malignant claims are assigned a lower scheduled value than are categories of malignant claims. The relationship of values between categories, however, has changed. The modifications reflect today's tort system experience. *See* 2002 TDP, *supra,* section A; Transcript Sept. 4, 2002, *supra,* at 3–4 (David Austern, general counsel of the Manville Trust).

The ratio of compensation for claimants suffering from the most serious diseases to compensation for claimants with non-disabling conditions has risen significantly. A claimant in the highest scheduled dis-

ease category under the 2002 TDP will be paid 30 times or more than the compensation paid a claimant in the lowest scheduled disease category (assuming a *pro rata* share of 5%; if the *pro rata* share is raised, the ratio will increase). This is an upward shift from a ratio of slightly greater than 15 to 1 under the 1995 TDP. The changes made to the levels and scheduled values, in conjunction with the other changes, are designed to remedy the current misallocation of funds.

Changes in the criteria that must be met for claims to qualify for a scheduled category reflect increased medical knowledge regarding asbestos exposure and its consequences. All levels now require, at a minimum, "a report submitted by a qualified physician stating that the claimant has or had an x-ray reading of 1/0 or higher on the ILO scale, or bilateral pleural plaques or pleural thickening (or, if an ILO reading is not available, a chest x-ray reading that indicates bilateral interstitial fibrosis, bilateral insterstitial markings, bilateral pleural plaques or bilateral pleural thickening consistent with, or compatible with, a diagnosis of asbestos-related disease)." TDP 2002, *supra*, section D. Asbestosis claims require a combination of lung abnormalities as shown in an ILO X-ray reading or diagnosed through pathology according to *Asbestos-associated Diseases, Special Issue of the Archives of Pathology and Laboratory Medicine*, Vol. 106, No. 11, App.3, Oct. 8, 1982, and pulmonary function impairment as demonstrated through TLC or FVC plus FEV1/FVC ratio. Claims at all levels are subject to the more stringent evidentiary requirements set forth in section E and discussed below.

The new Level I is "Other Asbestos Disease." Its scheduled value is a fixed Cash Discount Payment of $600. In order to qualify for this category, claimants must show diagnosis of a Bilateral Asbestos–Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma and exposure to Manville asbestos products. Claimants in this category receive the full $600, not a *pro rata* share of that value. Those at all other levels receive a *pro rata* share of the scheduled value of their claims. Thus, should the *pro rata* share increase from the present 5% the relative ratio received by this lowest catchall category claim will decrease; this is the likely result of the New TDP. *See* Section IV.A.1.e, *infra (pro rata* share).

Level II is Asbestosis/Pleural Disease and has a scheduled value of $12,000. Claimants must show diagnosis of a Bilateral Asbestos–Related Nonmalignant Disease, six months occupational exposure to Manville asbestos products, and five years cumulative occupational exposure to asbestos.

One particularly significant change from the 1995 TDP is an additional requirement of "significant occupational exposure" to qualify for Levels III to VII (with the exception of Level VI, discussed below) Significant occupational exposure requires occupational exposure to raw asbestos fibers on a regular basis for a cumulative period of at least five years; it is defined in more detail in section E(2)(b) of the 2002 TDP. Levels III to VII also require at least six months occupational exposure to Manville asbestos products prior to December 31, 1982 and medical documentation that asbestos exposure was a contributing factor in causing the pulmonary condition or cancer in question.

Level III is also Asbestosis/Pleural Disease. It has a scheduled value of $25,000. The requirements for qualification for these claims are tightened from those for Category II under the 1995 TDP. Level III claims require a greater degree of pulmonary impairment as determined

through chest X-rays and pulmonary function testing than must be shown for Level II claims. Level III claims must provide a diagnosis of asbestosis supported by an ILO X-ray reading of 1/0 or greater or determined by pathology, or chest wall pleural thickening or plaque with a width at its maximum of at least 5mm and a total length of at least one quarter of the projection of the lateral chest wall. The 2002 TDP cites to the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, *Asbestos-associated Diseases*, vol. 106, No. 11, App. 3, Oct. 8, 1982 and William S. Cole, M.D., *The Classification of Radiographs of Pneumoconiosis, in A Study Syllabus for Classification of Radiographs of Pneumoconioses* 21–24, footnote 13 (W.J. Tuddenham, M.D. ed., NIOSH April 1983) as providing appropriate standards from the diagnosis of Level III asbestosis and pleural disease. Level III claimants must also demonstrate pulmonary function impairment through a TLC of less than 80% of normal or a FVC of less than 80% of normal plus a FEV1/FVC ratio greater than or equal to 65%.

Level IV is Severe Asbestosis and has a scheduled value of $95,000. Claimants must demonstrate significantly greater pulmonary alteration and impairment than is required to meet the criteria for Level III. Level IV claimants must provide a diagnosis of asbestosis through an ILO reading of 2/1 or greater or as determined by pathology. They must also show pulmonary function impairment through a TLC of less than 65% of normal or a FVC of less than 65% of normal plus a FEV1/FVC ratio greater than 65%.

Level V is Other Cancer and has a scheduled value of $45,000, an increase over the scheduled value for other cancers under the 1995 TDP. It requires, in addition to diagnosis of a primary colorectal, laryngal, esophageal, pharyngeal, or stomach cancer, evidence of an underlying Bilateral Asbestos–Related Nonmalignant Disease. Stomach cancer was not among the other cancers included under the 1995 TDP.

Level VI is Lung Cancer (One). It has no scheduled value since all claims in this disease category are to be individually evaluated. Claims that fall into this Level are those in which there is a diagnosis of a primary lung cancer, but the claims do not meet the medical and/or exposure requirements necessary to qualify for Level VII. Level VI is intended to encompass claimants suffering from lung cancer who have no underlying asbestos-related disease, no significant occupational exposure as defined in section E.2.(b) of the 2002 TDP, and/or are smokers. The average of the individual evaluation awards in the Level is anticipated to be $40,000 (capped at $50,000), but substantial variation is expected.

Level VII is Lung Cancer (Two) and has a scheduled value of $95,000, an increase from the scheduled value under the 1995 TDP. It requires diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos–Related Nonmalignant Disease. The requirement under the 1995 TDP that the claimant be a non-smoker for this claim has been eliminated, but the 2002 TDP declares in a footnote that non-smokers who qualify for this level may want to have their claims individually evaluated since they are likely to exceed the scheduled value for this category.

Level VIII is Mesothelioma. The requirements to qualify for this category are essentially identical to those under the 1995 TDP—diagnosis of mesothelioma and evidence of exposure to Manville asbestos products. The scheduled value has increased significantly, from $200,000 under the 1995 TDP to $350,000. The Trust

intends to make retroactive payments of $7500 (5% of $150,000, the increase in the scheduled value for this disease category) to claimants who were paid a 5% *pro rata* share under the 1995 TDP scheduled value of $200,000 to compensate for the short-lived reduction from 10% for this serious category. *See* Transcript Sept. 4, 2002, *supra,* at 4.

In addition to the changes in the scheduled disease values for the various categories, there are also several substantial changes to the assigned maximum values. *See* 2002 TDP, *supra,* Attachment A. The maximum value for Level IV, Severe Asbestosis Disease, has been increased to $400,000. The maximum value for Level VI, Lung Cancer (One), has been decreased drastically to $50,000. The maximum value for Level VIII, Mesothelioma, has been increased to $750,000. The maximum value for Level I is $600, the fixed assigned value for that category.

### b. Evidentiary Requirements

Section E, Evidentiary Requirements, is an addition to the 2002 TDP. It sets forth standards that both medical evidence and exposure evidence submitted by claimants must meet. It incorporates requirements of evidence showing a ten year latency period included in the 1995 TDP. It also incorporates requirements that a diagnosis of a nonmalignant asbestos-related disease must be based upon an X-ray read by a certified B–Reader and pulmonary function testing if the claimant is alive at the time the claim is filed.

The New TDP adds a provision mandating that all diagnoses be based on physical examinations. In addition, the Trust must be satisfied that all medical evidence submitted is "credible and consistent with recognized medical standards" and may direct the submission of such documentation as it requires to support this determination. These provisions will allow the Trust to

ensure that claims meet adequate standards of proof (that is, standards of proof that would entitle them to compensation in the tort system). These requirements will likely require most facilities currently conducting asbestos screening to change their processing of potential claimants. *Cf. also In re Diet Drugs,* 236 F.Supp.2d 445 (E.D.Pa.2002) (authorizing additional audits of claims submitted by specified doctors and firms to prevent depletion of trust fund through payments to ineligible persons).

### c. *Pro Rata* Share

Under the 1995 TDP, an increase in the *pro rata* share would have entitled earlier claimants to additional payments so as to equalize the *pro rata* share of the liquidation value of claims over time. 1995 TDP, *supra,* section A. A decrease in the *pro rata* share did not affect claimants whose claim was liquidated before the decrease. *Id.* The 2002 TDP contains a provision noting that the 1995 TDP did not anticipate that changes in the *pro rata* share might also be accompanied by changes in the disease categories and their assigned values. If the *pro rata* share is increased to more than ten percent, under the 2002 TDP the Trust, the SCB, and the Legal Representative will determine whether additional payments to claimants who have already been paid ten percent of the liquidated value of their claims would serve the TDP's goal of treating all claimants equitably. 2002 TDP, *supra,* section A, H.1.(a), H.2.(a).

The Trust, the SCB, and the Legal Representative have agreed to continue paying claimants a 5% *pro rata* share under the 2002 TDP until mid–2003. *See* Pro Rata Share Memo., *supra;* Transcript Sept. 4, 2002, *supra,* at 5. During that period, claim filing trends will be monitored and quarterly reports issued. *See* Pro Rata Share

Memo, *supra*. As a result of the changes made, the Trust anticipates that a dramatic increase in the *pro rata* share should be possible on or shortly after June of 2003. Transcript Sept. 4, 2002, *supra*, at 5–6.

#### d. Other Changes

Other changes to the TDP are intended to clarify provisions of the 1995 TDP; to make the trust distribution process run more smoothly, efficiently, and equitably; and to take account of new medical knowledge and other changes in circumstances since the 1995 TDP was created. The most important are described below.

Under the 1995 TDP, claimants had six months with the option to request an additional six months to accept the Trust's offer before the offer would be deemed withdrawn. 1995 TDP, *supra*, section B.2.(b). The 2002 TDP allows claimants significantly longer to respond. Claimants initially have 360 days. If they fail to respond within that time, the claim will be deactivated. Claims remain in a deactivated status for two years before they are deemed withdrawn. They can be reactivated at the request of the claimant at any time during those two years for the purpose of accepting the Trust's last offer. 2002 TDP, *supra*, section B.2.(b).

Arbitration of the categorization or individual evaluation of a claim under the 2002 TDP must be based on the documentation in the claim file at the time the claim was categorized. 2002 TDP, *supra*, section B.2.(d). The 1995 TDP required "documentation in the claim file." 1995 TDP, *supra*, section B.2.(d).

The 2002 TDP requires the concurrence of the Legal Representative in several situations in which the 1995 TDP required the concurrence of only the Trust and the SCB. The Legal Representative now must agree to the development of new Disease Categories and Scheduled Values for Non–Standard Claims, 2002 TDP, *supra*, section C.1.(b); decisions to require additional kinds of supporting medical evidence, *id.*, section C.7; and the establishment of a special Extraordinary Claims Panel, *id.*, section C.9.

A provision further defining claimant's jurisdiction for the purposes of the factors to be considered in the individual evaluation of claims is added by the 2002 TDP. A claimant may elect the jurisdiction in which he was exposed to Manville asbestos, the jurisdiction in which he resides at the time of diagnosis, or the jurisdiction in which he resides at the time the claim is filed. *Id.*, section C.3.

Claimants whose claims were liquidated after November 19, 1990, the post-class action complaints, are allowed under the 2002 TDP to have their claims placed at the front of the FIFO queue if they choose not to retain their previous liquidated value. *Id.*, section C.5.

The 2002 TDP adds a provision prohibiting a second injury claim for malignancies where the malignancy was diagnosed prior to the date of settlement of the non-malignancy claim. *Id.*, section C.6.

The New TDP adds a provision concerning claimants who qualify for Exigent Health treatment. It establishes an irrebuttable presumption that living claimants with confirmed mesothelioma qualify for such treatment since there is normally substantial medical doubt that they will survive beyond six months. It also establishes a rebuttable presumption that living claimants with confirmed lung cancer caused by asbestos exposure qualify for Exigent Health treatment. 2002 TDP, *supra*, section C.10.(a). Other living claimants can qualify for Exigent Health or Extreme Hardship treatment on the basis of the same documentation as was required by the 1995 TDP. *Id.*, section C.10.(b),(c).

### e. Transition Provisions

The Transition Provisions were designed to enable the Trust to continue functioning smoothly. Claimants with dates of diagnoses after August 31, 2002 will be subject solely to the provisions of the 2002 TDP. Claimants diagnosed earlier with First In First Out ("FIFO") numbers greater than 445,000 may elect to re-file their claims and be treated under the 2002 TDP. This group includes all claimants subject to the decreased *pro rata* share of 5%. All claimants whose claims are resolved pursuant to the 2002 TDP are subject to any increase or decrease in the *pro rata* share; claims will be processed according to the *pro rata* share operational at the time the claim is liquidated.

Mesothelioma claims may be filed and paid pursuant to the 2002 TDP at once. All other claims filed pursuant to the 2002 TDP will be accepted by the Trust beginning January 2, 2003.

### 2. Other Measures

Transaction costs of the Manville Trust are already lower than those in the tort system or of most other bankruptcy trusts. *See* RAND Report 2002, *supra*, at 60–62. Individuals compensated by the Trust receive 70 percent of total dollars paid by the Trust, as compared to the less than 50 percent of the total dollars spent on litigation received by plaintiffs in the tort system. *Id.*

Further efforts have been made by the Trust to reduce costs and expenses in order to preserve funds to compensate claimants. The Trust fully implemented an electronic claims filing process, e-Claims™ (patent pending) in May 2002. *See* Manville Personal Injury Settlement Trust Reports, Third Quarter 2002. It is expected that electronic filing will cut costs to the Trust substantially. *See* Transcript Dec. 13, 2002, *supra*, at 20 (statement of David Austern, general counsel of

the Manville Trust) (cutting costs in half). The Trustees of the Manville Trust have cut substantially the fees that they receive. *See* Transcript Sept. 4, 2002, *supra*, at 35–36. Attorneys' fees under the 1995 TDP (and continuing under the 2002 TDP) are capped at 25% of the payment made by the Trust to the claimant. 25% attorneys' fees are among the lowest nationally. *See generally* Bell, *supra*, at 38 ("lawyers routinely receive 33% to 40% of each recovery, often aggregating to millions of dollars").

### B. Criticisms of the 2002 Trust Distribution Process

Despite the significant improvements made by the 2002 TDP, it is not perfect. Valid criticisms are supportable. Formulation of a trust distribution process that will meet the Trust's goal of treating claimants equitably has been an on-going process. The rapidly changing contours of the asbestos problem and the current lack of adequate data to make accurate future projections mean that reevaluation will probably continue to be necessary.

The Trust, the SCB, and the Legal Representative have agreed to reporting mechanisms that will allow them to respond quickly if the 2002 TDP is unsuccessful in repairing the major problems that it was designed to address. Transcript Sept. 4, 2002, *supra*, at 5. They, together with the courts, will continue to address changing circumstances.

In this light, the courts find it useful to set forth and respond to some of the cogent criticisms of the 2002 TDP, and to address some of the remaining problems in achieving a workable solution.

A number of interested parties submitted critiques of the 2002 TDP following its September 4th submission to the courts. They include Steven Kazan, a prominent asbestos plaintiffs' lawyer who focuses on

the representation of seriously injured claimants; a group of solvent Co–defendants—Owens–Illinois, Inc.; 3M Company; General Electric; Exxon Mobil Corporation; Sears Roebuck and Company; Union Carbide Corporation; The Dow Chemical Company; Union Pacific Railroad; Garlock Sealing Technologies, LLC; Anchor Packing Company; and Combustion Engineering, Inc. ("Co-defendants"); and the Unofficial Committee of Select Asbestos Claimants ("SAC").

All presentations focused primarily on "stem[ming] the tide of questionable claims." SAC Supplemental Memorandum, *supra*, at 6. In addition to the substantive criticisms, all also voiced their concern that there had been insufficient opportunity to express views in the TDP amending process. The participation of the Co-defendants is only mandated by the TDP for amendment of the arbitration procedures of section E or subsections 1–5 and 8–9 of section H. *See* 1995 TDP, *supra*, section H.8; 2002 TDP, *supra*, section I.8 (sections in the 2002 TDP have been renumbered as a result of the addition of section E on Evidentiary Requirements). These subsections remain unchanged in substance in the 2002 TDP, and the Co-defendants' rights under the TDP have thus not been directly affected. Mr. Kazan and the SAC were peripherally involved in the negotiations leading to the 2002 TDP. Under the TDP, the SCB is charged with speaking on behalf of all claimants' counsel. It is up to the SCB to determine how best to reach a negotiated consensus on a position that best represents and protects the interests of constituents, taking into account the multiplicity and wide variance of views that currently exists among plaintiffs' counsel. *See, e.g.,* John Meroney, *Even Lawyers Are Getting Sick of Abuses in Asbestos Litigation,* L.A. Times, Dec. 10, 2002, Commentary.

As pointed out in Section IV.A, *supra,* the 2002 TDP is the result of hard-fought, arms-length negotiations between the Trust and the representatives of the current and future claimants. It is both reasonably fair to affected parties and a substantial improvement over the 1995 TDP in light of current circumstances. It reflects compromises fairly calculated to deal with the problems that arose when the 1995 TDP proved inadequate in dealing with unforeseen changes in circumstances. No one has provided reasons adequate to upset those compromises at this time.

Mr. Kazan provided a useful and thoughtful summary of some of the problems that are not addressed, or that may be created, by the 2002 TDP. *See* Steven Kazan, Memorandum of Interested Attorney (Sept. 23, 2002) ("Kazan Memorandum of Sept. 23, 2002"). He points out that the effect of the 2002 TDP is not known, and that the changes may not do enough to ensure that all those injured by asbestos will receive equitable compensation. *Id.* at 4 (noting that there are no "modeling or simulations of the impact of these changes on claim rates or cash flow needs").

Mr. Kazan is particularly concerned with preserving funds to compensate those who are the most seriously injured. He fears that the Manville TDP as amended will in practice favor unimpaired claimants in a number of ways. *See id.* at 4–5. First, while the Manville compensation ratio of mesothelioma to the two lowest scheduled levels of claims is much greater under the 2002 TDP than under the 1995 TDP, it is still substantially lower than some other current compensation programs. As noted above, the new Manville ratio of mesothelioma to the two lowest levels of claims is about 30 to 1; in the Owens–Corning National Settlement Program, which Mr. Kazan asserts relies on the "best available data," the ratio is more than 80:1. *Id.* at

5; *see also generally* Joseph B. White & Jim VandeHei, *Owens Corning Files for Chapter 11, Citing Escalating Asbestos–Liability Claims,* Wall Street J., Oct. 6, 2000, at A3 (Owens·Corning files for bankruptcy as a result of increasing asbestos claims despite national settlement program).

Second, Mr. Kazan correctly notes that the effect of any decrease in *pro rata* payment will be to favor claims in Level I:

> At the current payment percentage of 5%, every Level II case valued at $12,000.00 is in fact worth the same as Level I, and the new plan provides that Level I is exempt from the risk of payment percentage reduction. Thus, the more Level I and II cases that are filed, the more money will be drained from the Trust, and as the payment percentage drops, the Level II claims will naturally migrate to Level I and in effect receive a higher payment percentage than anyone else.

Kazan Memorandum of Sept. 23, 2002, *supra,* at 6. It is also possible, but unlikely, that the transitional provisions of section M will further benefit unimpaired claimants at the expense of those who are more seriously injured. *Id.* at 8. The 2002 TDP preliminary calculations suggest, contrary to his concern, that the percentage paid will be increased from 5% rather than be reduced.

As an example of a protection that would do more to ensure compensation for the most seriously injured, Mr. Kazan suggests the creation of a separate protected pool of funds solely for malignancies and serious asbestosis as was accomplished, for example, in the ·Babcock & Wilcox bankruptcy. *Id.* at 3; *see also* SAC Supplemental Memorandum, *supra,* Ex. A (draft TDP adopted by the Official Committee of Asbestos Personal Injury Claimants in the Babcock & Wilcox matter).

Mr. Kazan also was concerned that the evidentiary requirements of the 2002 TDP are inadequate to ensure that "medical evidence provided in support of ... claim[s] is credible and consistent with recognized medical standards." Kazan Memorandum of Sept. 23, 2002, *supra,* at 6–7. The Trust must act, he insists, to ensure that the physical examinations now required are "real physical examinations of the quality required by the various workers' compensation boards throughout the country." *Id.* He correctly points out that additional research on the most effective and efficient methods of assessing whether an individual is suffering from an asbestos-related condition is badly needed. That issue is discussed in Section IV.C.2, *infra.*

The Co-defendants acknowledge the improvements made by the 2002 TDP. *See* Supplemental Submission of Solvent Co-defendants Regarding Amendments to the Manville TDP, at 5 (Sept. 24, 2002) ("Supplemental Submission of Co-defendants") ("[T]he amended TDP improves the ratio of mesothelioma payments to non-malignancy payments, and ... reduces the compensation paid to individuals with mildly disabling asbestosis....."). They assert, however, that the 2002 TDP does not adequately address the root of the problems facing the Trust, mass screenings. Co-defendants' primary concern is ensuring that claimants have a real medical diagnosis of an asbestos-related disease and the 2002 TDP's alleged failure in meeting this goal. They contend that screenings arranged by plaintiffs' lawyers mass produce claims involving no impairment on the basis of no real medical evidence, and that the revenues received by attorneys from these claims divert Trust assets from the sick and dying and are used in part to fund more inappropriate screenings.

Among the 2002 TDP's failures, the Co-defendants list: the absence of a require-

ment for Level I and II claims of proof of pulmonary function abnormalities, the absence of a requirement for these claims of medical documentation establishing asbestos exposure as a contributing factor to the condition asserted, the failure to reduce the values of these claims to a level that would no longer encourage "litigation screening," the general requirement that an X-ray be merely consistent with a diagnosis of asbestos-related disease, and the absence of an express requirement of "a medical diagnosis by a qualified physician who acknowledges that he or she has a doctor/patient relationship with the claimant." Supplemental Submission of Co-defendants, *supra*, at 5–8. The Co-defendants suggest three changes to the 2002 TDP that would help to allay their concerns: (1) require a medical diagnosis by a treating physician for every claimant; (2) require non-malignancy claimants to show asbestos-related impairment, and (3) apply the amended TDP to all claims.

The SAC agrees that the "modifications proposed are, to some extent, an improvement on the Trust's previous structure and distribution process," but, like Mr. Kazan and the Co-defendants, contends that the changes in the 2002 TDP "do not go far enough to rectify the problems facing the Trust and its beneficiaries." Unofficial Committee of Select Asbestos Claimants, Supplemental Memorandum on SCB Proposed Trust Modifications, at 2 (Sept. 24, 2002) ("SAC Supplemental Memorandum"). Its concern is with protecting the seriously ill. It cites with approval several particular features of the proposed TDP in the Babcock and Wilcox bankruptcy proceedings that it believes would better accomplish this goal. It, as Mr. Kazan, suggests the division of claims into two distribution pools, with one reserved solely to pay the classes of individuals with more serious claims (malignancies and serious asbestosis disease). Further increases in the number of unim-

paired claims filed, since these claims would be paid out of the second pool of funds, would not affect the assets available to compensate the seriously injured. It also recommends the elimination of individual review for non-malignant unimpaired claims as a measure that would save substantial costs.

The major deficiencies of the 2002 TDP identified by the SAC mirror those enumerated by Mr. Kazan and the Co-defendants. The medical evidence required for the submission of a claim, while an improvement, is allegedly insufficient to verify that a claimant suffers from an injury caused in substantial part by asbestos exposure. The absence of a requirement of significant occupational exposure to Manville asbestos for Disease Level I and II claims will purportedly increase the risk that claimants will be compensated for non-asbestos-related respiratory diseases arising out of occupational exposure in non-traditional industries. Furthermore, the SAC voices its suspicion that the shift in the disease levels and scheduled values will actually encourage the proliferation of unimpaired claims, likely offsetting any increase in percentage of total dollars paid to the most seriously ill, making it impossible to raise the *pro rata* percentage paid by any significant amount. The SAC also asserts that the modifications made by the 2002 TDP should be implemented immediately without grandfathering claimants diagnosed before September 1, 2002.

The SAC agrees with the Co-defendants' proposals concerning even more stringent medical standards for the diagnosis of asbestos-related diseases and for the application of the 2002 TDP to all claimants who have not yet been paid. It also proposes additional, more wide-ranging modifications to the 2002 TDP. It would create a separate pool of funds to pay compensation solely to the most seriously injured, and it

would eliminate or drastically reduce any cash discount payment, making all claimants regardless of disease level subject to the *pro rata* share. It would also make individual review unavailable for Level I–III claims.

In considering these criticisms, it is important to keep in mind the goal of the Manville Trust and the principles necessitating revision of the TDP. The Trust's stated purpose is "to treat *all* claimants equitably." 1995 TDP, *supra*, section A; 2002 TDP, *supra*, section A (emphasis added). While it is certainly important in achieving this goal to compensate the most seriously injured claimants to the fullest extent possible with the limited fund available, to avoid a disproportionate allocation of funds, and to prevent compensating fraudulent or undeserving claimants, this does not mean that valid claims submitted by less seriously injured claimants can be excluded almost entirely. These claimants have apparently valid claims for compensation, both in the tort system (as a general matter, although, as pointed out above, the acceptance of these claims is by no means uniform) and under the Manville Trust. *See* Section III.B, *supra.* To ignore them would be to violate the fundamental principles of the Trust.

As is evidenced by the long and still evolving history of problems faced in asbestos litigation and by the Manville Trust, there is no single right answer that will eliminate this crisis. There are numerous alternative means, both proposed and not yet thought of, to attempt to preserve funds so that all claimants who have suffered asbestos-related injury receive some equitable compensation for their claims. Many of the proposed modifications— among them requiring non-malignancy claimants to show impairment, making proposed changes to medical evidence requirements, creating separate pools of funds, eliminating a cash discount pay-

ment, and doing away with continue individual review for Level I–III claims—embody policy choices other than those adopted by the Manville Trust and the Authorized Parties. While some of these proposals have merit, they do not justify abandoning the compromises contained in the 2002 TDP.

The 2002 TDP recognizes the need to increase the percentage of Trust claims settlement payments going to cancer claims. The Authorized Parties have elected to accomplish this by shifting disease levels, revising scheduled values, enhancing evidentiary requirements, and streamlining costs to the Trust. Acknowledging the difficulty, if not impossibility, in accurately predicting the impact of any amendment of the claim criteria on claims filing behavior, the Authorized Parties have further elected to continue paying the interim 5% share, to track closely changing trends in claims filing, and to act quickly in the event that the 2002 TDP does not have the desired effect in minimizing the problems currently faced by the Trust. This approach appears well designed, although admittedly not beyond any criticism, to achieve the goals stated by the Authorized Parties:

> The Trustees project that under the 2002 TDP, between 55% and 60% of Trust settlement payments will go to cancer claimants, a proportion never previously reached. The Authorized Parties also hope to be in the position to raise the pro rata share after some experience under the 2002 TDP. In sum, the 2002 TDP is designed to achieve the goals painstakingly negotiated in the class action settlement that produced the 1995 TDP: payment to all Beneficiaries of as equal a share of their claims' value as possible, at a reasonable *pro rata* share.

Response to the Submissions of the Unofficial Committee of Select Asbestos Claimants ("SAC"), the Solvent Co–Defendants, and Steven Kazan, at 6 (Oct. 4, 2002).

The SAC's argument that the amendments of the TDP should be implemented immediately without grandfathering appears to be based on a misinterpretation of the transition provisions of the 2002 TDP. First, claimants diagnosed prior to September 1, 2002 will not receive any benefit of the shift in schedule values under the 2002 TDP without also being subject to the stricter medical criteria for the evaluation of claims. Claimants diagnosed prior to September 1, 2002 and with First In First Out ("FIFO") numbers greater than 445,-000 may elect to refile under the 2002 TDP, but if they choose to do so they will be subject to the new restrictive provisions.

The criticisms posed by Mr. Kazan, the Co-defendants, and the SAC, while cogent and useful, do not merit the extraordinary step of judicial intervention at this point. They do highlight potential deficiencies and areas for particular attention in the evaluation of claim filing trends and the future performance of the TDP.

C. Future

1. Required Research on National Medical Questions

There are significant gaps in the data available concerning the screening of individuals who believe they have been exposed to asbestos but who do not show signs of functional impairment.

Foremost among the problems caused by this lack of data is the question of how to develop and run an efficient and effective program of screening for asbestos-related diseases. Research on more objective, alternative, and complementary testing methods is needed. Essential is an opinion from an impartial and reliable national organization concerning the most appropriate methods of screening for asbestos-related injuries with potential alternatives and their feasibility.

The topic of screening for asbestos-related disease frequently leads to discussion of medical monitoring, or "medical surveillance to determine whether [those exposed to asbestos] are experiencing changes in their health that might be related to the development of some asbestos-related disease over the course of time." Henderson & Twerski, *supra*, at 818. Comprehensive medical monitoring in populations of asbestos-exposed workers seems to be of limited utility, although some studies have shown that an earlier diagnosis of lung cancer might lead to statistically significant higher rates of survival. *See, e.g.,* Kazan Memo. of Dec. 7, 2001, *supra*, at 7 (citing Paul Brunetta, *Early Detection of Lung Cancer*, Mealey's Asbestos Conference 1999, at 67–73 (1999); Gordon Gamsu, *Recent Developments in Spiral CT Scanning*, Mealey's Asbestos Conference 2000, at 107–114 (2000); Claudia I. Henschke et al., *Early Lung Cancer Action Project: Initial Findings on Repeat Screening;* Annette McWilliams et al., *Combination of Computer–Assisted Sputum Analysis and Low–Dose Spiral CT Scan for Lung Cancer Screening;* Albert Miller & Steven Markowitz, *Screening for Early Lung Cancer in High–Risk Workers Exposed to Asbestos and Radiation);* Steven Kazan, Memorandum of Interested Attorney (Aug. 30, 2002) ("Kazan Memo. of Aug. 30, 2002"), at 3–4 (citing J.H. Austin et al., *CT Screening for Early Stage Lung Cancer*, 121 Chest 1725–26 (May 2002); T. Nawa et al., *Lung Cancer Screening Using Low–Dose Spiral CT: Results of Baseline and 1–Year Follow-up Studies*, 122 Chest 15–20 (July 2002)).

Screening designed to identify lung cancer and other asbestos-related malignancies earlier might prove beneficial. Yet,

given the apparent lack of an effective treatment and cure for asbestosis and mesothelioma, earlier detection of these more serious diseases, while making it possible for individuals to receive compensation more promptly, may not have significant medical benefits. *See, e.g.,* Parloff, *supra.* For additional discussion of the treatment of medical monitoring claims in the courts, see generally Henderson & Twerski, *supra,* at 836–49. These issues suggest additional problems for future research.

Gaps in data also cause serious problems in the projection of future claims. There are apparently insufficient statistics concerning the percentage of individuals showing clinical evidence of asbestos-related exposure such as pleural thickening who will probably become functionally impaired as a result of their exposure to asbestos. Also seemingly lacking is firm knowledge of the length of time before such conditions become debilitating. There are even contentions that exposed individuals who demonstrate pleural plaques or pleural thickening are less likely to eventually suffer from a more serious asbestos-related disease. *See, e.g.,* Brickman, *supra,* at 3. A percentage of presently unimpaired individuals do, however, develop asbestosis or asbestos-related malignancies. Current estimates of the percentage of unimpaired claimants who later suffer from malignancies range up from 1/20th of 1%. *See, e.g.,* Henderson & Twerski, *supra,* at 832; Justice Helen Freedman, Statement at "Asbestos: What Went Wrong," Symposium, Bar Association of the City of New York (Oct. 21, 2002). A comprehensive analysis of these questions would aid bankruptcy trusts like the Manville Trust—and future trusts—in projecting future claims and making appropriate awards.

The formulation of the questions to be posed for study is important. It involves first a determination of who will articulate the questions; it would be best to have the involvement of a community of lawyers, judges, epidemiologists, and medical specialists. There are a number of ways of proceeding. A district court or bankruptcy court could appoint a functionary to meet with interested parties and then circulate proposals for formulation of the issues. *See* Fed.R.Civ.P. 53. The functionary could begin to produce a statement of questions that would be the most helpful to industry, medicine and law.

Possible questions have been proposed in several different contexts. W.R. Grace, in a brief to the bankruptcy court in Delaware in its own bankruptcy proceedings, framed the problems requiring further study as follows:

*Question relating to diagnostic data*

- *Pulmonary function tests:* What result from PFT testing provides reliable, reproducible proof of impaired lung function or of impairment due to asbestos-related restriction?

- *Radiographic results:* What ILO category provides reliable, reproducible evidence of diffuse fibrosis? What procedures/standards should be followed in verifying that any particular X-ray reading is reliable and reproducible or that a particular reading of 1/0 or less is reliable and reproducible?

*Questions relating to the diagnosis of asbestosis*

- *Pathologic diagnosis:* If pathologic evidence is available, what pathologic evidence is required to reliably and consistently diagnosis [sic] asbestosis?

- *Diagnosis based upon ILO readings of 1/0 or less:* Absent pathologic evidence sufficient to diagnose asbestosis or impaired lung function as shown through validated PFT test results, can a reliable diagnosis of asbestosis be made

on the basis of unverified ILO readings of 1/0 or less?

*Pleural findings and impairment*

- *Pleural findings:* Do pleural plaques constitute impairment of clinical disease?
- *Impairment:* Absent impaired lung function as shown though validated PFT test results, does diffuse pleural thickening constitute impairment or clinical disease?

*Dose and causation*

- *Mesothelioma:* Is the causation of mesothelioma by asbestos exposure dose-dependent? At what lifetime dose of asbestos has reliable, reproducible scientific evidence demonstrated causation of mesothelioma from asbestos exposure—a two-fold excess of risk above the background risk of mesothelioma in the general population?
- *Asbestosis:* Is the causation of asbestosis by asbestos exposure dose-dependent? At what lifetime dose of asbestos has reliable reproducible scientific evidence demonstrated causation of asbestosis from asbestos exposure—a two-fold excessive risk above the background?
- *Lung cancer:* Is the causation of lung cancer by asbestos exposure dose dependent? At what lifetime dose of asbestos has reliable, reproducible scientific evidence demonstrated causation of lung cancer from asbestos exposure—a two-fold excess of risk due to asbestos exposure?

W.R. Grace's Supplemental Brief Regarding Procedures for the Litigation of the Common Personal Injury Liability Issues at 24, *In re W.R. Grace & Co. et al* (Bankr.D. Del. June 21, 2002) (No. 01–01139) ("W.R. Grace's Supplemental Brief"). These questions are somewhat narrow and specific to resolution of the Grace bankruptcy proceeding. They could provide a starting point in formulating the issues for resolution by a scientific advisory committee.

Mr. Kazan proposed the following question:

Would it be useful to undertake a CT scan screening program designed to detect early stage treatable lung cancer in a population of very high risk asbestos-exposed workers? If so:

(1) How should the group to be studied be defined:

(a) The study group: number of workers, geographic distribution, sampling design;

(b) Individuals—age, exposure history, smoking history.

(2) How should the study be organized?

(3) What would the study cost?

Kazan Memorandum of Sept. 23, 2002, *supra,* at 10.

It is important to identify an appropriate organization to conduct the research needed. W.R. Grace, in a brief to the bankruptcy court in Delaware in its own bankruptcy proceedings, proposed the appointment of a Rule 706 panel. W.R. Grace's Supplemental Brief, *supra,* at 23; Fed.R.Evid. 706. It would be particularly useful to have an independent science foundation or other national panel not connected to the trusts or other interested parties undertake such studies.

The National Academy of Sciences, the National Science Foundation, the American Thoracic Society, the American College of Chest Physicians, the International Early Lung Cancer Action Project, and the National Institute of Occupational Safety and Health of the Centers for Disease Control have all been proposed as possibly qualified, neutral organizations that might undertake research on these issues. The National Academy of Sciences may be the most appropriate entity.

The National Academy of Sciences is a private non-profit society of scholars engaged in scientific research. It was established by Congress in 1863 to "investigate, examine, experiment, and report on any subject of science or art." 36 U.S.C. § 150303; *see also* 36 U.S.C. §§ 150301–150304. The Academy depends on governmental and private funding from individuals, companies, foundations, and other philanthropies. Collectively, the National Academy of Sciences, the National Research Council, the National Academy of Engineering, and the Institute of Medicine are called the National Academies. For more information about the National Academy of Sciences, see their website at http:/ /www. nationalacademies.org/nas/ nashome.

Most of the studies conducted under the auspices of the National Academy of Sciences are carried out by the National Research Council. Approximately 85% of the National Research Council's funding comes from the federal government; the remaining 15% comes from state governments, private foundations, industrial organizations, and the Academies. A large percentage of the studies conducted are initiated by the federal government or internally, but some are proposed by external sources, for example, state agencies, foundations, universities, industry, Academy and Institute members and units of the National Academies.

The Research Council performs its work independently of both sponsors and those who propose studies, subjecting all research to a rigorous process designed to ensure that the results are scientifically accurate, balanced, and objective. Subjects for study undergo several stages of review before acceptance. In determining which topics to address, the Council considers "the importance and timeliness of the question, its background, the audience, likely impact, the range of competencies that must be represented on the committee if the question is to be examined adequately, and funding sources." The National Research Council Process, *at* http:// www. nationalacademies.org/about/ faq4.html. Once accepted, a committee of volunteers undertakes research and produces a report, conclusions, and recommendations, which are then subjected to a process of institutional and external review before being approved by the Council. For more information about the National Research Council, see the website for the National Academies at http://www. nationalacademies.org/about/ faq.html.

The National Science Foundation is an independent agency of the United States government. It funds approved scientific research proposed by other organizations. For more information about the National Science Foundation, see their website at http://www.nsf.gov.

The American Thoracic Society ("ATS") is an independently incorporated non-profit educational and scientific organization. This fall, the ATS announced its intention to establish a new ATS Research Program. The ATS has begun developing a research fund, but this program is not yet operational. For more information about the American Thoracic Society, see its website at http://www.thoracic.org.

The American College of Chest Physicians is a not for profit society of physicians, PhDs, and other associated health professionals. Its funding comes from membership dues, activity revenues, and grants from corporations and foundations. The CHEST Foundation, an arm of the ACCP, funds research, but the ACCP does not appear to initiate or organize studies on its own. For more information about the American College of Chest Physicians, see its website at http://www.chestnet.org.

The International Early Lung Cancer Action Project is a program led by the New York Weill Cornell Medical Center. The Project has already conducted a study that shows that CT Screening can detect lung cancer at earlier stages than an ordinary X-ray. A more extensive study is currently being conducted. Participants in both studies were at high risk of lung cancer because of their smoking histories. The Project seems to be focused almost exclusively on lung cancer and CT Screening, and thus may not be appropriate for general asbestos research. For more information about the International Early Lung Cancer Action Project, see its website at http://www.ielcap.org.

The National Institute of Occupational Health and Safety of the Centers for Disease Control is the government agency responsible for conducting research and making recommendations for the prevention of work-related disease and injury. NIOSH has undertaken asbestos-related studies in the past, and funds research with grants. It is responsible for the B-Reader certification program and is involved in cancer research and risk and exposure assessment generally. It focuses largely on preventing hazards in the workplace, and therefore may not be the most appropriate agency to research these issues. For more information about the National Institute of Occupational Health and Safety of the Centers for Disease Control, see their website at http://www.cdc.gov/niosh/homepage.html.

Congress or one of its committees or individual members might well initiate requests for necessary studies, with preliminary work from the Library of Congress.

### 2. Alternative Solutions

There are a number of possible ways out of the asbestos crisis. Various alternatives have been discussed in more detail elsewhere. *See, e.g.,* Bell, *supra;* Behrens, *supra;* Henderson & Twerski, *supra;* Hensler, *supra;* Issacharoff, *supra;* Behrens & Parham, *supra;* Rothstein, *supra;* Schuck, *supra;* Katherine L. Aschenbrenner et al., *Notes for Remarks on Asbestos: New Problems and Proposed Solutions,* 30 Product Safety and Liability Reporter 1053 (Nov. 25, 2002). They include no change in the status quo, new proposals for dealing with the asbestos problem through the tort system, and legislation. If matters remain as they are, an increasing number of bankruptcies will result and the American economy will be negatively impacted. *See generally* Stiglitz et al., *supra.*

New proposals for dealing successfully with the asbestos problem through the court system, including a plaintiff class action, a defendant class action, or innovations in bankruptcy proceedings, are useful; more effective use of class actions would probably save industry billions of dollars and permit avoidance of bankruptcy in most cases. *See* Aschenbrenner et al., *supra,* at 1056.

The most appropriate resolution to the asbestos problem may be through federal legislation. This was recognized by the Supreme Court in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 597–98, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) and again in *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 821, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), when it emphasized the need for legislative intervention in the "elephantine mass of asbestos cases." 527 U.S. at 821, 119 S.Ct. 2295. A number of possible outlines for such legislation have been published. *See, e.g.,* Asbestos Compensation Act of 2000, H.R. 1283, 106th Cong. (1999) (introduced as the Fairness in Asbestos Compensation Act of 1999; companion bill to S. 758); Aschenbrenner et al., *supra;* The Asbestos Alliance, Proposed Legislative Solution, *available at* http://www.as-

bestossolution.org/solution.html; *see also GOP Leaders Plan to Take Up Asbestos Next Session,* Congress Daily, Dec. 3, 2002, available at 2002 WL 102859633.

## V. Conclusion

It is vital for the Manville Trust to respond to recent trends, including the continuing rise in claims, the forced reduction in the *pro rata* amount paid on claims, and the "misallocation of available funds, inequitably favoring those who are less needy over those with more pressing asbestos-related injuries." *In re Joint E. & S. Dists. Asbestos Litig.,* 2001 WL 1464362 (E.D.N.Y.2001). Two major issues had to be addressed: inadequate required proof of illness and excessive allocation of resources to the unimpaired.

With the courts' encouragement, the Authorized Parties have acted appropriately to amend the trust distribution process pursuant to section K of the 1995 TDP. The 2002 TDP is a substantial improvement over the 1995 TDP. Despite well-founded objections, the Authorized Parties, most of the plaintiffs' bar, and the Trust have agreed that the terms of the 2002 TDP are appropriate. They are reasonably calculated to confront the Trust's challenges in the near future. The Authorized Parties will continue to respond as necessary in the long-term.

The courts express their gratitude to the Trustees, employees of the Trust, the Selected Counsel for the Beneficiaries, the Legal Representative of Future Claimants, the Special Advisor to the Trust, and the many attorneys who have cooperated in amending and commenting on the 2002 TDP.

The courts approves these amendments.

SO ORDERED.